EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In re:<br><br>Aprobación de enmiendas al Reglamento del Tribunal de Apelaciones | 2018 TSPR 33<br><br>199 DPR ____ |

Número del Caso: ER-2018-3
 (Numero corregido mediante Resolución *Nunc Pro Tunc*)

Fecha: 23 de febrero de 2018

Materia: Resolución del Tribunal con Voto de Conformidad, Voto Particular de Conformidad y Votos Particulares Disidentes.
(Se incluyen además dos (2) Resoluciones *Nunc Pro Tunc*)

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*In re:*

ER-2018-1

Aprobación de enmiendas al
Reglamento del Tribunal de
Apelaciones

RESOLUCIÓN

En San Juan, Puerto Rico, a 23 de febrero de 2018.

La Constitución de Puerto Rico, su Artículo V, Sección 1, dispone que "el Poder Judicial de Puerto Rico, se ejercerá por un Tribunal Supremo…". LPRA Tomo I. Por su parte, el Artículo V, Sección 7, de la Constitución de Puerto Rico, LPRA Tomo I, establece que "el Tribunal Supremo, adoptará reglas para la administración de los tribunales las que estarán sujetas a las leyes relativas a suministros, personal, asignación y fiscalización de fondos, y a otras leyes aplicables en general al gobierno. El Juez Presidente, dirigirá la administración de los tribunales y nombrará un director administrativo, quien desempeñará su cargo a discreción de dicho magistrado." Estos preceptos constitucionales contienen una doble delegación de poderes de administración de los tribunales entre el Pleno del Tribunal y la figura del (de la) Juez(a) Presidente(a). Al Tribunal Supremo se le delegó la autoridad de adoptar reglas de administración de los tribunales y al (a la) Juez(a) Presidente(a) la facultad de dirigir la administración de los tribunales y de asignar un Director Administrativo. Véanse, a manera de ejemplo, <u>In re Aprobación de las Reglas para los Procedimientos de Investigaciones</u>, 184 DPR 575, 582 (2012);

<u>In re Disposiciones del Código Electoral de Puerto Rico para el Siglo XXI</u>, 184 DPR 369 (2012); <u>In re: Aprobación del Reglamento de Subastas Formales de la Rama Judicial</u>, 2017 TSPR 35. Véase, también, Diario de Sesiones de la Convención Constituyente de Puerto Rico 2613 (Ed. 1961).

Mediante la Ley Núm. 120-2017, la Asamblea Legislativa reconoció nuestra facultad constitucional de reglamentar. En atención a nuestra facultad constitucional, se enmiendan las Reglas 4, 5, 7, 9, 60 y 87 del Reglamento del Tribunal de Apelaciones. Las Reglas enmendadas leerán como se indica a continuación:

*Regla 4 — Administración*

    (A) […]

    (B) […]

    (C) […]

    (D) […]

    (E)

      (1) al (4) […]

      (5) Hacer recomendaciones al Tribunal Supremo, al Juez Presidente o Jueza Presidenta y al Director Administrativo o Directora Administrativa de los Tribunales sobre todo asunto dirigido a facilitar, acelerar y uniformar los sistemas y procedimientos administrativos en el Tribunal de Apelaciones.

      (6) al 10 […]

      (11) Designar Jueces y Juezas sustitutos o reasignar recursos a otros paneles para atender los asuntos judiciales cuando sea necesario por razón de inhibiciones, recusaciones, vacaciones, enfermedad o ausencia de un Juez o Jueza, de acuerdo con lo dispuesto por este Reglamento.

      .     .     .     .     .     .     .     .

*Comentario:* […]

*Regla 5 — El Secretario o Secretaria*

    (A) al (K) […]

    (L) Mantener dentro del tribunal el expediente original bajo su custodia o cualquier documento que forme parte de dicho expediente, excepto por orden del Panel de Jueces o Juezas que atiende el caso en particular.

.        .        .        .        .        .        .
.

*Comentario:* […]

*Regla 7 — Funcionamiento*

   (A) Paneles

   (1) El Tribunal de Apelaciones funcionará en paneles de no menos de tres Jueces y Juezas, y no más de siete Jueces y Juezas, designados por el Juez Presidente o Jueza Presidenta según lo dispuesto por este Reglamento, cuyas sesiones y vistas podrán celebrarse en el Centro Judicial de la Región Judicial correspondiente del Tribunal de Primera Instancia donde se originó el asunto bajo su consideración.

   (2) El Juez Presidente o Jueza Presidenta designará los Jueces y Juezas que compondrán los Paneles y designará a un Juez o a una Jueza del Panel para presidirlos. La designación de los Presidentes y Presidentas de Paneles debe hacerse en orden estricto de antigüedad entre los Jueces y Juezas disponibles. El Juez Administrador o Jueza Administradora deberá presidir el Panel en que participe. El resto de los Paneles serán presididos por el Juez o Jueza de mayor antigüedad en estricto orden de la totalidad de los miembros del Tribunal, excepto cuando el Juez o Jueza rechace la designación o cuando sea removido por justa causa. En esas situaciones, lo sustituirá el próximo Juez o Jueza con más antigüedad.

   (3) El Juez Presidente o Jueza Presidenta designará Paneles para que atiendan aquellos casos que se les asignen con independencia de la Región Judicial en que se originen. A cada Panel se le asignará una identificación, que no estará delimitada por Región Judicial. El proceso para completar la composición de los Paneles será aleatorio. Consistirá en la celebración de un sorteo en que se colocarán en una tómbola todos los nombres de los Jueces y Juezas del Tribunal de Apelaciones que no presiden Paneles. Deberá levantarse un acta notarial sobre este proceso. Este sorteo será abierto al público. Luego de la celebración del primer sorteo, se deberá realizar una redistribución anual de los Paneles del Tribunal de Apelaciones, excepto los Presidentes y Presidentas de Panel a los que alude el inciso anterior. En la redistribución anual deberá seguirse el proceso aleatorio antes descrito.

(4) Conforme sus prerrogativas constitucionales, recogidas en la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 2003, el Juez Presidente o Jueza Presidenta podrá asignar según disponga el Pleno del Tribunal Supremo, por reglamento, por virtud de requerimientos del servicio, Jueces y Juezas del Tribunal de Apelaciones para laborar en el Tribunal de Primera Instancia, Jueces y Juezas del Tribunal de Primera Instancia para laborar en el Tribunal de Apelaciones o de designarlos individualmente para atender un caso o asunto, o cualquier encomienda relacionada con la Rama Judicial.

(B) Asignación de casos

(1) Una vez constituidos los Paneles se asignarán los casos siguiendo como criterio único la fecha y hora de su presentación. Solo podrá saltarse el orden establecido en casos de inhibiciones, recusaciones o no intervenciones. Cuando ello ocurra, deberá asignarse el caso al próximo Panel, respetando siempre el principio de antigüedad entre los Presidentes de Panel. El Presidente o Presidenta de cada Panel, a su vez, asignará sin dilación los recursos a sus miembros. Los casos de confinados e indigentes se asignarán proporcionalmente a los Paneles, independientemente de la fecha y hora de su presentación.

El Juez Administrador o Jueza Administradora llevará un listado aparte para la asignación de casos nuevos en los que se presenta una moción en auxilio de jurisdicción u otra moción urgente junto con el nuevo recurso. Estos casos se asignarán a los Paneles siguiendo como criterio único la fecha y hora de su presentación. Solo podrá saltarse el orden establecido en casos de inhibiciones, recusaciones o no intervenciones.

En caso de que un Juez o Jueza se inhiba, recuse o no intervenga en un caso del Panel al que pertenece, el Juez Administrador o Jueza Administradora, deberá designar un Panel Especial para atender el asunto. El Panel estará compuesto por los Jueces o Juezas restantes y uno o una que el Juez Administrador o Jueza Administradora designe. Esta designación se hará por orden invertido de antigüedad, comenzando con el Juez o Jueza de menor antigüedad que no forme parte del Panel del Juez sustituido o Jueza sustituida y terminando con el Juez o Jueza de mayor antigüedad.[1]

---

[1] La designación de Jueces y Juezas para sustituir en Paneles especiales se inspira en la Regla 4(b) del Reglamento del Tribunal Supremo, 4 LPRA Ap. XXI-B.

En cuanto a la composición de los Paneles especiales que se constituyen durante el periodo de verano, también deberá respetarse el principio de antigüedad en cuanto a la Presidencia de los Paneles.

Los Jueces y las Juezas del Panel que atendieren un asunto o recurso, continuarán constituidos en Panel hasta su resolución, sin perjuicio de sus responsabilidades en otros Paneles.

(2) al (5) [...]

*Regla 9 — Inhibición, recusación; no intervención*

(A) al (D) [...]

(E) Cuando un miembro de un Panel no pueda intervenir en la decisión de algún asunto, el Juez Administrador o Jueza Administradora asignará otro Juez u otra Jueza para la consideración del recurso, conforme al orden establecido en la Regla 7(B)(1) de este Reglamento.

*Regla 60 – Competencia*

El recurso de revisión será atendido por el Panel designado conforme a lo dispuesto en la Regla 7(A)(3) de este Reglamento.

*Regla 87 — Disposiciones diversas*

(A) a (C) [...]

(D) ~~Región Judicial se refiere a los Paneles dispuestos en el Art. 5.005 de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 2003~~.

*Comentario:* [...]

Las enmiendas incorporadas al Reglamento del Tribunal de Apelaciones entrarán en vigor en sesenta días, tendrán vigencia inmediata y serán aplicables a todos los procedimientos pendientes ante dicho Tribunal.

Notifíquese por correo electrónico al Director Administrativo de los Tribunales y al Director de la Oficina de Prensa.

Publíquese.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Martínez Torres emitió un Voto de Conformidad. La Jueza Asociada señora Pabón Charneco emitió un Voto Particular de Conformidad al cual se unieron los Jueces Asociados señor Kolthoff Caraballo y señor Rivera García.

El Juez Asociado señor Estrella Martínez "está conforme con la reglamentación aprobada. Como bien señalamos en el Voto de Conformidad en *In re* Aprobación de las Reglas para los Procedimientos de Investigaciones, 184 DPR 575 (2012), los contornos del poder de reglamentación del Pleno de este Tribunal están debidamente delimitados. A tenor con el análisis jurídico allí contenido, estoy conforme con el ejercicio de reglamentación aprobado en el día de hoy. No se trata de una usurpación de poderes, sino del ejercicio de una facultad constitucional dirigida a establecer mecanismos más objetivos en la asignación de jueces y juezas. Es un proceso tan objetivo, en comparación con el actual, que ninguno de los nueve miembros de este Tribunal tendremos injerencia en la selección de jueces y juezas de los paneles del Tribunal de Apelaciones. Además, tiene como base medidas exitosamente adoptadas por la Rama Judicial, tales como que los miembros de mayor antigüedad en este Tribunal presiden las Salas de Despacho y el método de selección aleatorio contemplado en procesos electorales.

Negar que el sistema actual de asignación de jueces y juezas ha sido cuestionado por diversos sectores de la sociedad y, en no pocas ocasiones, ha arrojado dudas sobre procesos sensitivos de la democracia, como por ejemplo, la creación de paneles especiales sorpresivos en casos de alto interés público, es enajenarse de la realidad y de las aspiraciones de transparencia que el Pueblo le reclama a la judicatura. Ciertamente, la reglamentación adoptada erradica la posibilidad de manipulaciones subjetivas, o su apariencia, en esta etapa tan crucial para la confianza del Pueblo en la Rama Judicial". El Juez Asociado señor Martínez Torres se unió a estas expresiones.

La Jueza Presidenta Oronoz Rodríguez emitió un Voto Particular Disidente. La Juez Asociada señora Rodríguez Rodríguez emitió un Voto Particular Disidente. El Juez Asociado señor Colón Pérez emitió Voto Particular Disidente.

Juan Ernesto Dávila Rivera
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*In re:*

ER-2018-1

Aprobación de enmiendas al
Reglamento del Tribunal de
Apelaciones

Voto de Conformidad emitido por el Juez Asociado señor MARTÍNEZ TORRES al cual se unieron los Jueces Asociados señor RIVERA GARCÍA y señor FELIBERTI CINTRÓN.

En San Juan, Puerto Rico, a 23 de febrero de 2018.

Las reglamentaciones que aprobamos hoy le dan mayor confiabilidad y transparencia a la asignación de jueces y casos en el Tribunal de Apelaciones, así como a la evaluación de los jueces del Tribunal de Primera Instancia. Hacemos esto en el ejercicio legítimo de nuestros poderes constitucionales y sin menoscabar las facultades de la Juez Presidenta para dirigir la administración de la Rama Judicial.

Puntualizo que el Art. V, Sec. 7, de la Constitución de Puerto Rico, 1 LPRA, establece que la Juez Presidenta "dirigirá la administración de los tribunales..."; no dice que será la administradora plenipotenciaria, ni que actuará por su cuenta, o

sin pesos y contrapesos. La Constitución tampoco dice que el Tribunal Supremo está impedido de reglamentar criterios para la asignación de jueces en los tribunales de Puerto Rico. Por el contrario, la misma Sec. 7 de la Constitución reconoce expresamente la facultad de adoptar "reglas para la administración de los tribunales…". Por eso, no es posible reclamar al mismo tiempo que la designación de jueces en los paneles del Tribunal de Apelaciones es un acto de administración y, acto seguido, que el Pleno carece de autoridad para reglamentar ese acto de administración.

En el pasado, hemos delimitado los contornos de los poderes de reglamentación del Pleno del Tribunal. Véase, In re Aprobación de las Reglas para los Procedimientos de Investigaciones, 184 DPR 575 (2012). El análisis, basado en un estudio del texto de la Constitución, el Diario de Sesiones de la Asamblea Constituyente y las ponencias que allí se consideraron, nos lleva, en síntesis, a la conclusión siguiente: En nuestro sistema republicano de gobierno, nadie tiene facultades omnímodas o absolutas. El Pleno del Tribunal Supremo tiene facultad de supervisar y reglamentar la administración de la Rama Judicial, como freno o contrapeso de la facultad de la Juez Presidenta para dirigir la administración de nuestros tribunales. En el gobierno no tenemos monarcas ni emperadores. Por eso este Tribunal ha rechazado todo revisionismo de esta historia constitucional.

Ante esa realidad y lo ya resuelto al respecto, ahora se aduce que el proceso para aprobar hoy estas medidas reglamentarias fue irregular. Ya que se trata de un proceso interno técnico que no es de conocimiento general, conviene aclarar el récord en público, para ser transparentes y despejar sombras: Las enmiendas propuestas se trajeron a la agenda de una reunión del Pleno del Tribunal, por acuerdo de la mayoría de los integrantes de este Foro, según se provee en la Regla 6(a) del Reglamento del Tribunal Supremo, 4 LPRA Ap. XXI-B. Lejos de tratarse de un formalismo o de un proceso inútil, se discutieron y se aprobaron enmiendas a ambas propuestas reglamentarias, tanto en esa reunión como posteriormente. Se acordó entonces, según refleja la minuta de la reunión, que se esperaría por enmiendas adicionales antes de fijar la fecha de certificación del nuevo reglamento para la evaluación de jueces. Se acordó también que las enmiendas al reglamento del foro intermedio se certificarían hoy. El miércoles 21 de febrero, al no recibir propuestas adicionales de enmiendas al reglamento para evaluar jueces, se acordó certificarlo hoy también. Todos esos acuerdos se tomaron por mayoría del total de miembros del Tribunal. Ni siquiera para declarar inconstitucional una ley se requiere más que eso. Const. PR, Art. V, Sec. 4.

A pesar de eso, algunos integrantes de este Foro prefirieron ausentarse de la reunión en la que se

discutieron estas propuestas. Con esa decisión personal, privaron al Tribunal -y más importante, al Pueblo de Puerto Rico- del insumo de su conocimiento, experiencia y de considerar sus inquietudes acerca del contenido de las propuestas reglamentarias, si tenían alguna. La realidad es que todos tuvimos la oportunidad de participar y aportar. Quien no participó lo hizo por decisión propia. Prefirieron "llevarse la bola y el bate" porque no les agradó el resultado. Lamento que, al no prevalecer, algunos nieguen la realidad e intenten desacreditar esta institución. Creen que ven fantasmas, pero en realidad lo que divisan es un reflejo de su propia imagen.

Tomo nota de las críticas, pero rechazo que el proceso fuera irregular. La realidad es que estas propuestas reglamentarias han circulado en el Tribunal durante las últimas dos semanas y han sufrido cambios necesarios que las mejoraron. A los integrantes de este Tribunal que sí participaron en ese proceso, incluyendo a la Juez Presidenta, que también participó y aportó a mejorar las propuestas, ofrezco mi respeto y reconocimiento. Solo quiero dejar claro para el récord histórico, qué sucedió realmente. Lo demás es una cacofonía trillada y formalista, carente de sustancia. Es mucho ruido y pocas nueces.


                              RAFAEL L. MARTÍNEZ TORRES
                                   Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| In re:<br><br>Aprobación de enmiendas al Reglamento del Tribunal de Apelaciones | ER-2018-1 | |

Voto particular de conformidad emitido por la Jueza Asociada señora PABÓN CHARNECO.

En San Juan, Puerto Rico, a 23 de febrero de 2018.

Las experiencias que viví durante casi nueve años como Jueza del Tribunal de Apelaciones me llevan a la indiscutible conclusión de que las enmiendas que se aprueban en el día de hoy no solo son adecuadas, sino necesarias para lograr un sistema judicial más transparente, imparcial y objetivo.

Aunque no me proponía emitir expresiones al respecto, las acciones de la Jueza Presidenta Oronoz Rodríguez, la Juez Asociada Rodríguez Rodríguez y del Juez Asociado Colón Pérez en el trámite de aprobación de las mencionadas enmiendas no me dejan otra alternativa. Sintetizo el mencionado trámite a continuación.

El 6 de febrero de 2018, la Jueza Presidenta entregó a todos los miembros de este Tribunal un borrador de Resolución mediante el que planteó unas enmiendas al *Reglamento del Tribunal de Apelaciones* y a las *Reglas para la Administración del Tribunal de Primera Instancia.* En lo pertinente al Tribunal de Apelaciones, propuso: 1)

mantener su facultad para designar los Jueces que componen los Paneles y sus correspondientes Presidentes; 2) conservar la potestad para considerar elementos tan amplios y subjetivos como "la materia o las características de los casos" en dichas designaciones; y 3) tener la autoridad de asignar los recursos mediante un proceso "aleatorio", sin definir en qué consistiría este.

Con el encomiable propósito de que la asignación de Jueces y de recursos se realizara de la manera más objetiva posible, el 13 de febrero de 2018, un compañero Juez Asociado propuso otras enmiendas al Reglamento del Tribunal de Apelaciones. Además, expresó la posibilidad de considerarlas y discutirlas en el Pleno que se celebraría el 16 de febrero de 2018. Sin embargo, de conformidad con lo que claramente establece la Regla 6 de nuestro Reglamento,[2] reconoció que una mayoría del Tribunal debía aprobar la referida discusión.

Luego de que una mayoría del Tribunal aprobara discutir el asunto en el referido Pleno, el Juez Asociado señor Colón Pérez entregó una carta a todos los miembros del Tribunal. Allí, manifestó su oposición a las enmiendas propuestas por el compañero Juez Asociado (las cuales son, en esencia, las aprobadas en el día de hoy), mediante fundamentos sin validez jurídica y expresiones carentes de elegancia y respeto hacia los miembros de este Tribunal. Específicamente, indicó que debido a que

---

[2] Dicha Regla 6 del Reglamento, 4 LPRA Ap. XXI-B, establece lo siguiente: "Por acuerdo de la mayoría de los jueces y las juezas, se podrá considerar cualquier asunto en la reunión ordinaria de Pleno".

las mencionadas enmiendas eran "inconstitucionales en toda su extensión", no acudiría al Pleno, que la decisión de la "exigua mayoría" de discutir el asunto en dicho Pleno era una actuación que "laceraba la ya *maltrecha imagen* del poder constitucional que represent[a] [el Tribunal]" y que "no validar[ía] con su presencia en dicha reunión la *toma por asalto* de la Rama Judicial [...], en particular de los poderes que [le asisten a la Jueza Presidenta] para administrar la misma".

Finalmente, el 16 de febrero de 2018, se celebró el Pleno. Es pertinente llamar la atención a un suceso ocurrido allí que "como poco, es incómod[o] y tiene el nocivo efecto de poner en tela de juicio la imparcialidad"[3] de la Jueza Presidenta. En la discusión de las enmiendas propuestas, esta expresó que en la última designación de los Presidentes de Paneles tomó en consideración la afiliación política de estos.[4] Por su parte, la Juez Rodríguez Rodríguez abandonó erráticamente

---

[3] *Alvarado Pacheco y Otros v. E.L.A.*, 188 DPR 594, 717 (2013) (Voto particular disidente, Juez Asociada Rodríguez Rodríguez).

[4] En su ponencia, la Jueza Presidenta indica que tergiverso la verdad y que miento burdamente. La verdad es que, por vergüenza ajena, suavicé las palabras de ésta en el Pleno, pero como hoy yo también dormiré tranquila, seré un poco más específica. Todos los miembros presentes del Pleno fuimos testigos de las expresiones de la Jueza Presidenta. Para ejemplificar uno de sus "logros" y *como si se tratara de un asunto político, arguyó que, entre los Jueces Presidentes de los Paneles del Tribunal de Apelaciones, había designado cinco del Partido Nuevo Progresista, cinco del Partido Popular Democrático y dos del Partido Independista.* Esto es admitido por la misma Jueza Presidenta en su ponencia cuando dice que en el Pleno indicó que entre los Presidentes de Panel había personas de "todas las ideologías políticas". Ello nunca debió ser destacado y exaltado. Las ideologías políticas no pueden considerarse y punto. Mientras eso no le quede claro a la Jueza Presidenta, no pasaré la página.

la reunión, tras argüir que las enmiendas eran inconstitucionales. Ello, sin explicar sus fundamentos para tal argumento.

En síntesis, los tres compañeros se opusieron a las enmiendas mediante la repetición de dos argumentos vacíos de bases jurídicas en un proceso de enmiendas que la propia Jueza Presidenta inició. Primero, sostuvieron, sin más, que las enmiendas propuestas eran inconstitucionales.

En ese sentido, hace falta que los tres compañeros relean las disposiciones constitucionales que se exponen en el comienzo de la Resolución que hoy se emite. La Sección 1 del Artículo V de la Constitución de Puerto Rico, LPRA Tomo I, establece claramente que "el Poder Judicial, *se ejercerá por un Tribunal Supremo*". Por otro lado, la Sección 7 del mismo Artículo dispone que "*el Tribunal Supremo adoptará reglas* para la administración de los Tribunales" y "el Juez Presidente, dirigirá la administración […]". Es decir, que contrario a lo que erróneamente opina el Juez Asociado Colón Pérez, los miembros de este Tribunal no tomamos la facultad de aprobar las reglas de administración por *asalto*. El Poder de reglamentación siempre le perteneció al Pleno de este Tribunal. Así ha sido reconocido por este Tribunal[5] y, recientemente, por la Asamblea Legislativa.[6]

---

[5] Véase *In re Reglamento de Subastas de la Rama Judicial*, 192 DPR 56, 59-60 (2014) ("La Comisión de la Rama Judicial de la Convención Constituyente estableció que la intención de esas cláusulas constitucionales era "*traspas[ar] al Tribunal Supremo* la facultad de

A pesar de la claridad de los Artículos de la Constitución antes discutidos, como disco que no para de girar y como segundo argumento, los tres compañeros arguyeron que era improcedente que se le quitaran poderes a la Jueza Presidenta. En cuanto a esto, opino que los poderes hay que saberlos usar y las expresiones de esta relacionadas a los criterios que utilizó en la última designación de los Presidentes de los Paneles del Tribunal de Apelaciones, ciertamente pone en tela de juicio su capacidad para ejercer los poderes que dice tener. El lenguaje exhibido por la Jueza Presidenta me hace recordar la subjetividad que viví en carne propia como Jueza del Tribunal de Apelaciones. Por ello, hoy ejerzo mi facultad para erradicarla totalmente y excluir la posibilidad de que continúe.

El criterio rector al momento de hacer una designación de Presidente de Panel no puede ser cuál gobernador lo nombra y/o su afiliación política. Ello menoscaba la independencia judicial, imparcialidad, transparencia y objetividad que deben prevalecer en la Rama Judicial. Ante tal menoscabo, la inercia no es opción.

---

administrar los tribunales de justicia de Puerto Rico [...]". 4 Diario de Sesiones de la Convención Constituyente 2613 (ed. Conmemorativa 2003). Es decir, que "constitucionalmente es el Pleno del Tribunal Supremo el que formula, de entenderlo necesario, el cuerpo de reglas administrativas de toda la Rama Judicial". […] *Así se evita una concentración excesiva de poder en una sola figura*". (Énfasis suplido).

[6] Véase Ley Núm. 120-2017.

Así y en virtud de la autoridad constitucional que tenemos para aprobar reglas que rijan la administración de la Jueza Presidenta, aceptamos hoy unas enmiendas con el norte de eliminar la consideración de criterios subjetivos, parcializados y políticos en el proceso de designación de los Paneles, Jueces Presidentes y recursos en el Tribunal de Apelaciones. Nada me parece más justo, objetivo, imparcial y transparente que designar a los miembros de los Paneles mediante un proceso aleatorio (tómbola) en el que ningún otro elemento importe; que elegir al Presidente de cada Panel, tomando en consideración solo el criterio de antigüedad, el cual es el más valioso para realizar la función de asignar los casos a los miembros del Panel; y que asignar los recursos solamente por fecha y hora de presentación.

La Jueza Presidenta Oronoz Rodríguez, la Juez Asociada Rodríguez Rodríguez y el Juez Asociado Colón Pérez se niegan, sin mayor análisis y argumentación, a coincidir con lo anterior. Irónicamente, al último no le parece un *asalto* a la Rama Judicial dejar en manos de una sola persona la encomienda. Tampoco le parece incorrecto -ni a las otras dos compañeras- que dicha persona tenga la potestad absoluta de considerar elementos poco objetivos en su gestión. Difiero enérgicamente. Mantener las enmiendas tal cual las propuso la Jueza Presidenta y seguir permitiendo la concentración excesiva de poder en una sola figura es lo que, indisputablemente, constituye

un robo de la transparencia, imparcialidad y objetividad que deben predominar en la Rama Judicial.

Durante los casi nueve años que fungí como Jueza del Tribunal de Apelaciones fui testigo de cómo la referida concentración de poder en una sola figura, así como sus facultades absolutas para designar Paneles, Presidentes y casos mediante el empleo de criterios subjetivos *y otros subyacentes*, permitieron que me cambiaran cuatro veces de Panel en un año, sin razón válida; que, en ocasiones, cuando tenía diferencias de criterio en algún caso, este se reasignara a otro Panel; que se designaran los miembros de los Paneles tomando en consideración criterios de "amistad" o "rencillas"; y que muchos jueces de mayor antigüedad, con experiencia de incalculable valor, nunca fueran nombrados Presidentes de Panel. Lamentablemente y según confirmado por varios de los Jueces del Tribunal de Apelaciones, dichas situaciones, así como el discrimen en virtud del gobernador que nombró a cada Juez, continúan.

Sin embargo, tengo la enorme satisfacción y confianza de que con las enmiendas que hoy aprobamos, cambiamos el curso del trayecto hasta el momento mal trazado. La historia que viví y la que han vivido hasta hoy los Jueces en el Tribunal de Apelaciones no se repetirá. De ahora en adelante, los Paneles no sufrirán cambios injustificados, todos los Jueces tendrán igual oportunidad de considerar los casos que llegan al

Tribunal, los Jueces se esforzarán, como profesionales, en llevar a cabo sus funciones sin importar quién se le asigne como compañero de Panel, los Jueces de mayor antigüedad tendrán la posibilidad de poner al beneficio de la Rama Judicial sus invaluables experiencias y, lo más importante, el Tribunal de Apelaciones no estará en riesgo de estar politizado.

No tengo la menor duda de que todo ello fortalecerá la confianza de los ciudadanos en nuestro sistema de justicia. Después de todo, "[l]a confianza pública en el Tribunal es fundamental para que los jueces podamos cumplir con nuestro rol en la democracia". *Alvarado Pacheco y Otros v. E.L.A., 188 DPR 594*, 720 (2013) (Voto particular disidente, Juez Asociada Rodríguez Rodríguez). "Esta confianza significa que el pueblo al que le servimos reconozca la existencia en nosotros de principios de independencia, rectitud, justicia e imparcialidad". *Id.*

Dado que el resultado al que querían llegar tres compañeros miembros de este Tribunal "es la antítesis de todo lo anterior",[7] dejo al criterio del lector de esta ponencia determinar quiénes son los que verdaderamente han aportado a la "maltrecha imagen" judicial a la que el Juez Asociado Colón Pérez hace referencia. También, dejo al juicio de los puertorriqueños determinar quiénes son los que, sin fundamentos jurídicos o con una

---

[7] *Alvarado Pacheco y Otros v. E.L.A.,* supra, pág. 720. (Voto particular disidente, Juez Asociada Rodríguez Rodríguez).

"acomodaticia interpretación constitucional", insisten en sus "ansias de poder" y atentan "contra la democracia". Hoy nos encargamos de que ni estas personas, ni ningún miembro de este Foro, tengan individualmente el poder. Hoy lo tiene la transparencia, la objetividad y la imparcialidad que siempre debieron imperar en la Rama Judicial.


                         Mildred G. Pabón Charneco
                              Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Aprobación de enmiendas al
Reglamento del Tribunal de          ER-2018-1
Apelaciones

Voto particular disidente que emitió la Jueza Presidenta ORONOZ
RODRÍGUEZ

En San Juan, Puerto Rico, a 23 de febrero de 2018.

Hoy, una mayoría de este Tribunal le anuncia al País que ha aceptado la invitación que recientemente le fuera cursada por las Ramas políticas para que ejerza control sobre la selección de los jueces y las juezas que vienen llamados a atender los casos judiciales que se presentan en nuestras cortes, incluyendo aquellos que se instan contra los funcionarios del Gobierno.

Para lograr tal cometido, el cual expresamente le está vedado por nuestra Constitución, los miembros de la mayoría han redactado un reglamento que pretende

suspender la autoridad constitucional de la Jueza Presidenta para seleccionar a los jueces conforme a criterios de eficiencia y competencia, entre otros; imponiendo ellos en vez un esquema de selección, vía sorteo manual[8], que en el fondo es manipulable por diseño.

Estimo que este proceder lamentable lacerará profundamente la legitimidad de este Tribunal, no sólo por su abierto desafío a nuestro orden constitucional, sino porque, en última instancia, habrá de quebrantar aún más la confianza misma que el Pueblo debe tener en esta institución.

Las designaciones que nuestros jueces reciben para ver los casos no deben estar sujetas a estas manipulaciones. No es aceptable ni tolerable que en momentos en que el País permanece atento al resultado de investigaciones sobre sus funcionarios, este Tribunal decida apartarse, sin autoridad legal para ello, del esquema constitucional imperante para asignar a nuestros jueces. Por ello, estoy obligada a disentir.

## I.

La Constitución del Estado Libre Asociado de Puerto Rico dispone, sin ambages, que "[e]l Juez Presidente

---

[8] Todo esto me hace recordar aquel cuento de Jorge Luis Borges, La Lotería de Babilonia que trata, precisamente, de un pueblo donde reina el azar y las decisiones se toman a base de una lotería. En el cuento todo comienza como un proceso justo y luego se degenera. El aparente azar es, en realidad, el resultado de la falta de responsabilidad que acaba convirtiendo la vida de las personas en un laberinto absurdo en el cual todo se le deja a la "suerte" y nadie tiene la culpa de lo que suceda.

dirigirá la administración de los tribunales". Const. P.R. Art. V, Sec. 7.

En materia de administración judicial, la Constitución le otorgó facultades amplias al Juez Presidente. *Negrón Soto v. E.L.A.*, 110 D.P.R. 664, 667 (1981). Ello es evidente con el alcance extenso que la Convención Constituyente le dio a la definición del término "administración" y al designar a este funcionario "como la persona encargada de la administración de los tribunales". 4 *Diario de Sesiones* 2613. Véase además J. Trías Monge, *El Sistema Judicial de Puerto Rico*, 125 (1978). El informe de la Comisión de la Rama Judicial de la Convención Constituyente dispuso:

> La Comisión hace constar que el término "administración", usado en esta sección, comprende, sin que se entiendan excluidas otras similares y análogas, las siguientes funciones:
>
> 1. Compilar estadísticas y preparar funciones.
> 2. Alquilar locales, comprar y proveer equipo y servicios.
> 3. Conceder licencias y vacaciones a funcionarios y empleados.
> 4. Investigar quejas y formular cargos, ante la autoridad correspondiente, contra funcionarios y empleados.
> 5. Autorizar desembolsos dispuestos por ley y revisar [supervisar] las cuentas de todos los tribunales.
> 6. **Asignar y trasladar jueces.**
> 7. Aprobar reglamentos para las distintas cortes.
> 8. Superentender [supervisar] en los tribunales.
> Informe de la Comisión de la Rama Judicial a la Convención Constituyente, 1952, págs. 12-13, (Énfasis suplido).

En virtud del texto y del trasfondo histórico de esta disposición, desde la creación constitucional de nuestro

gobierno se reconoció que la "facultad para administrar dada al Juez Presidente [...] comprend[e] la de asignar y trasladar jueces." *Pueblo v. Tribunal Superior*, 80 D.P.R. 504, 510 n.4 (1958). Es, pues, norma constitucional arraigada que "para una eficiente y ordenada administración de [la] justicia, los jueces [...] se asignan por el Juez Presidente del Tribunal Supremo a determinado sitio o demarcación dentro del distrito judicial, a tono con las exigencias del trabajo y la necesaria distribución del mismo, bajo la facultad que **incuestionablemente** tiene el Juez Presidente, de acuerdo con la Constitución, para dirigir la administración de los tribunales." *Id.*, a la pág. 510 (énfasis suplido).[9]

De hecho, así también lo reconoce expresamente otra disposición de nuestro texto constitucional que establece un mecanismo para que sea el propio Juez Presidente, y no el pleno del Tribunal, quien le asigne funciones judiciales a un juez asignado a un tribunal o sala que haya sido modificada o eliminada por ley. *Véase* Art. V, Sec. 13, Const. E.L.A., L.P.R.A., Tomo 1 ("De modificarse o eliminarse por ley un tribunal o una sala o sección del

---

[9] *Véase además Cosme v. Hogar Crea*, 159 D.P.R. 1, 8 & 10 (2003) ("el Juez Presidente, como parte de sus prerrogativas constitucionales, puede asignar jueces apelativos para llevar a cabo funciones del Tribunal de Primera Instancia. [...] Los cambios en las tareas que de ordinario le competen a cada juez sólo los puede ordenar el Juez Presidente del Tribunal Supremo mediante designaciones especiales".); *Negrón Soto v. E.L.A.*, 110 D.P.R. 664, 667 (1981) ("históricamente se ha reconocido la facultad del Juez Presidente para administrativamente relevar temporalmente a un juez de sus funciones judiciales y asignarle encomiendas especiales en distintos aspectos relacionados con la administración de [la] justicia u obligaciones del primero.").

mismo, la persona que en él ocupare un cargo de juez continuará desempeñándolo durante el resto del término por el cual fue nombrado, y <u>ejercerá aquellas funciones judiciales</u> *que le asigne el Juez Presidente* del Tribunal Supremo.") (Énfasis suplido).

Además, es conocido ampliamente que el sistema de administración judicial dispuesto por la Sección 7 del Artículo V de nuestra Constitución tuvo como precedente directo las recomendaciones de la *American Bar Association,* así como de los juristas Roscoe Pound y Arthur Vanderbilt, y la experiencia habida en las jurisdicciones estatales, particularmente Nueva Jersey.[10] *Véase Informe de la Comisión de la Rama Judicial, 4 Diario de Sesiones de la Convención Constituyente* 2613 (1961).[11]

En cuanto a las recomendaciones de la *American Bar Association,* los trabajos del juez Vanderbilt que sirvieron de base al Informe de la referida Comisión de la Convención Constituyente[12] enfatizaban que:

> that provision should be made in each state for a **unified judicial system with power and responsibility <u>in one of the judges</u> to assign judges to judicial service** so as to relieve

---

[10] *Véase Ramírez de Arellano v. Noguera*, 85 D.P.R. 823, 828 (1962) ("Hacia Nueva Jersey miramos al momento de ordenar nuestro presente sistema de administración de justicia.").

[11] Como se conoce, para "la adopción de la Sección 7 del Artículo V de nuestra Constitución, [...] la Convención Constituyente siguió el informe de la Comisión de la Rama Judicial". *Rullán v. Secretario de Hacienda*, 78 D.P.R. 521, 531 (1955)(Belaval, J., *concurriendo*).

[12] *Véase* Informe de la Comisión de la Rama Judicial, 4 *Diario de Sesiones de la Convención Constituyente* a la pág. 2610 ("Se sigue también en cuanto a esta sección la recomendación específica del American Bar Association sobre unificación de tribunales. Véase al efecto: Vanderbilt, A. T., Minimum Standards of Judicial Administration, 1949, pág. 29.").

congestion of dockets and utilize the available judges to the best advantage. [...]

These recommendations originated in the obvious necessity for improving the business methods of the courts in order to enhance their efficiency in performing their judicial functions. The first recommendation herein is paramount to the others; it contains a proposal for the management of court business in a systematic manner, under the direction of one judge whose power and responsibility it would be to utilize available judicial man power most effectively. [...]

The recommendation under consideration here calls, first of all, for a unified judicial system. [...]

New Jersey provides the clearest example of a unified judicial system together with provision for centralized administration and management of court business. The chief justice of the Supreme Court is administrative head of all of the New Jersey courts [.] [...] The **chief justice of the Supreme Court is authorized to assign judges** of the superior court to the divisions and parts thereof, and to transfer judges from one assignment to another as the need appears. He is also administrative head of the county courts, **with power to assign any judge** thereof to sit temporarily in the superior court or to sit temporarily without the county in another county court.

Arthur Vanderbilt, *Minimum Standards of Judicial Administration* a las págs. 29, 32 & 61 (1949) (énfasis suplido). *En igual sentido, véase* Arthur Vanderbilt, *Improving the Administration of Justice – Two Decades of Development*, 26 U. Cin. L. Rev. 155, 188 (1957) ("**Assignments of the judges should be made by the <u>chief justice</u> who is most familiar with the work of the individual judges and with the needs of each of the courts.**") (énfasis suplido).

Sobre los estándares de la *American Bar Association,* *véase además A.B.A. Standards Relating to Court Organization* 81 (1974) ("**The chief justice** [...] **should also exercise powers of** general supervision, including: [...] **assignment of judicial and non-judicial personnel**[.] [...] The chief justice should be authorized to designate individual judges and committees of judges to assist him in carrying out these responsibilities.") (énfasis suplido).

Así pues, y conforme resaltó el Presidente de la Convención Constituyente, Dr. Antonio Fernós Isern, surge que el esquema de administración judicial que fijó la Sección 7 del Artículo V de nuestra Constitución:

> implements the establishment of a unified court system. [...] **The Chief Justice is placed in charge of the administration of the courts**[.] [...] Administration of the courts was understood by the Convention to mean not only performance of the routine "housekeeping" functions but also conduct of the judicial business of the courts. **The most important aspect of the latter is the <u>assignment of judges</u> and cases in order to relieve congested dockets, distribute work equitably among the judges, and prevent delays costly to litigants.**

*Notes and Comments on the Constitution of the Commonwealth of Puerto Rico* 91-92 (1952) (énfasis suplido).

Por tanto, surge de toda la historia constitucional antes reseñada que "[e]n nuestro sistema unificado [...] [e]s el Juez Presidente [...] el que distribuye la carga judicial entre los distintos jueces componentes del sistema, asigna a cada juez una sala en particular y luego

asigna los casos que se verán en esa sala." *Véase Cosme v. Hogar Crea*, 159 D.P.R. a las págs. 19-20 (Naveira de Rodón, J., *Op. de conformidad*, *a la cual se unió el Juez Asociado Corrada Del Río*).

Fue precisamente "[c]on la unificación de los tribunales, [incorporada por nuestros Constituyentes, que se estableció que] los nombramientos [judiciales] se harían simplemente para 'juez de primera instancia' o para cargos en las divisiones que se decidiese establecer en el tribunal de jurisdicción original general, correspondiéndole al Juez Presidente del Tribunal Supremo la tarea de designar la sala específica en que el nominado serviría, lo que no impediría, por supuesto, el movimiento intercurial". José Trías Monge, *La Estructuración del Poder Judicial en la Constitución de Puerto Rico*, 46 Rev. Jur. U.P.R. 611, 621 (1977) (énfasis suplido).

La facultad de asignar jueces se centró, así, en la figura de la Jueza Presidenta como parte del sistema unificado de administración judicial adoptado por nuestros Constituyentes.[13] De esta forma, se superó la resistencia política de algunos legisladores de la época que "se oponía[n] [...] [a] la unificación de los tribunales, [debido a que] al abolir[se] la separación entre las cortes y por tanto los cargos judiciales fijos, atados a

---

[13] En cuanto al sistema unificado de *administración* que exige nuestra Constitución, *véase* Art. V, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1 ("Los tribunales de Puerto Rico constituirán un sistema judicial unificado en lo concerniente a jurisdicción, funcionamiento y administración.") (énfasis suplido).

determinados distritos, [se] destruía el poder existente de los senadores sobre las nominaciones". *Íd.*

En fin, bajo nuestro esquema constitucional "el poder y la facultad de asignar los jueces de instancia a las distintas regiones o distritos judiciales recae en la sana discreción del Juez Presidente de este Tribunal", *Pérez Reilly v. Club Deportivo Ponce, Inc.*, 126 D.P.R. 837, 844 (1990) (Rebollo López, J., *disintiendo*), y no en algún otro funcionario que pueda pretender ejercer control, directo o indirecto, sobre las asignaciones a Sala que reciben nuestros magistrados. Esto pues, "la incuestionable prerrogativa constitucional del Juez Presidente para mover y asignar los jueces"*, In re Reforma Judicial*, 136 D.P.R. 1, 11 (1994) (Negrón García, J., *voto separado*), propiamente forma parte del diseño constitucional conforme al cual se estructuró la administración de las cortes en Puerto Rico, y que procura fortalecer el concepto de un sistema unificado de tribunales, así como asegurar su eficiencia.[14]

---

[14] *Véase* José Trías Monge, *El Sistema Judicial de Puerto Rico* 221-222 (1978), *citando a A.B.A. Standards Relating to Court Organization, 1974*, pág. 81*, & A.B.A. Section on Judicial Administration, The Improvement of the Administration of Justice,* 5ta ed. 1971, pág. 14 ("The chief justice should [...] exercise powers of general supervision, including [...] **[a]ssignment of judicial and non-judicial personnel[.] [...] While general policy may appropriately be formulated by a group, responsibility for executing policy must be vested in an individual.** Logically, the chief justice of the State's highest court should have that responsibility and authority, **and in states having an integrated judicial system this is the common pattern**."). (Énfasis suplido) Para referencia adicional, *véase Building Fast Cleaning Services v. Asociación Condominio Borinquen Towers*, 147 D.P.R. 874, 879 (1999) ("La Constitución [...] provee que el Juez Presidente dirigirá la administración de los tribunales[.] [...] El interés perseguido por este mandato constitucional es garantizar la eficiencia en el funcionamiento de nuestro poder judicial y velar por el adecuado funcionamiento de todo el sistema, en

Por último, somos conscientes de que el pleno de este Tribunal tiene unos deberes y responsabilidades invaluables en nuestro esquema constitucional. De hecho, reconocemos que sus funciones transcienden el ámbito estrictamente judicial, pues también surge de la sección 7 del Artículo V de la Constitución que "[e]l Tribunal Supremo adoptará reglas para la administración de los tribunales las que estarán **sujetas** a las leyes relativas a suministros, personal, asignación y fiscalización de fondos, y a otras leyes aplicables en general al gobierno […]". Const. P.R. Art. V, Sec. 7 (énfasis suplido). Sin embargo, esa misma disposición constitucional se cualifica en lo sucesivo al indicar expresamente, no sólo que la reglamentación del pleno está sujeta a las leyes sino, que es la Jueza Presidenta quien "dirigirá la administración de los tribunales y nombrará un director administrativo, quien desempeñará su cargo a discreción de dicho magistrado". *Íd.*

Más aún, conforme observa Trías Monge, "[f]ue parte esencial de la intención legislativa [en la Convención Constituyente] evitar a todo trance huella alguna de administración colegiada." Trías Monge, 3 *Historia Constitucional de Puerto Rico*, 98 (1982). La administración colegiada se consideró y fue ampliamente

---

todo momento.") (citas internas omitidas); Efrén Rivera Ramos, *La administración de los tribunales en Puerto Rico: El diseño constitucional*, 46 Rev. Jur. U.I.P.R. 245, 247 (2012) ("La decisión de delegar la administración en el Juez Presidente [...] procuraba fortalecer el concepto de un sistema unificado de tribunales [...] [y] perseguía asegurar la eficiencia en la operación del sistema.").

descartada. Lo que prevaleció fue la necesidad de consolidar bajo la figura de la Jueza Presidenta una esfera de autoridad administrativa separada de la función del Tribunal Supremo, como cuerpo, de adoptar reglas, para "garantizarle [al poder judicial] eficiencia en su funcionamiento […]." 3 *Diario de Sesiones* 1667.

Se destila, del propio texto constitucional y del historial que dio lugar a su redacción un balance claro entre las funciones administrativas de la Jueza Presidenta y las facultades reglamentarias del Tribunal Supremo. Es por ello que cuando se trata de una facultad ejecutiva administrativa, como la asignación de jueces y juezas a las distintas salas de menor jerarquía, la Jueza Presidenta tiene un marco de acción independiente que no está subordinado a determinaciones administrativas concurrentes amparadas en la función reglamentadora que ostenta el Tribunal Supremo para adoptar reglas sobre la administración.[15]  Es decir, el pleno, en su función

---

[15] Para una discusión sobre esta distinción, *véase Ortiz v. Dir. Adm. De Los Tribunales*, 152 D.P.R. 161, 185 (2000) ("aclaramos que el que la Regla [...] haya sido formulada y aprobada por este mismo Tribunal, no la inmuniza de un escrutinio constitucional posterior. Al aprobar la Regla [...] ejercimos una función cuasilegislativa constitucional accesoria distinta e independiente de nuestra función primaria de adjudicar. [...] Al reglamentar no ejercemos simultáneamente nuestra función primaria de adjudicar controversias dentro de un proceso adversativo en el cual interpretamos la Constitución y las leyes. **Si al pasar juicio sobre una de nuestras reglas dentro de un proceso adversativo ésta resulta contraria a la Constitución, no podemos hacer otra cosa sino invalidarla como haríamos con cualquier otra reglamentación que contraviniese la Constitución.**") (Énfasis suplido); *Schneider v. Colegio de Abogados de Puerto Rico*, 917 F.2d 620, 629 & 640 (1er Cir. 1990) ("That the court chose to combine its rulemaking with its adjudication in the form of a single opinion does not detract from the nonjudicial nature of the Rule. [...] The 1986 Rule was the product not of judicial decision-making but of Puerto Rico Supreme Court rulemaking, and the district court therefore had jurisdiction to review its merits.").

cuasilegislativa, no puede despojar a la Jueza Presidenta de las facultades administrativas que le delegó la Constitución.[16]

## II.

En abstracción de todos los fundamentos constitucionales reseñados en la sección anterior, la Asamblea Legislativa y el Gobernador de Puerto Rico aprobaron recientemente la Ley Núm. 120-2017. El objetivo fue singular: despojar a la Jueza Presidenta de funciones constitucionales de naturaleza administrativa para traspasarlas al pleno de este Tribunal. En lo pertinente a esta Resolución, el Artículo 6 de esa ley enmendó el Artículo 2.012 de la Ley de la Judicatura, Ley Núm. 201-2003, no tan solo pretende autorizar al pleno de este Tribunal a reglamentar este asunto, sino que lo faculta para ejercer directa y afirmativamente las acciones

---

[16] Para referencia sobre la norma imperante en Nueva Jersey, de donde se deriva nuestro modelo presidencial, *véase Kugler v. Helfant*, 421 U.S. 117, 128 (1975) ("it is not the New Jersey Supreme Court, or its members, but the Chief Justice, who is the 'administrative head' of the New Jersey court system."); *State v. Linares*, 470 A.2d 39, 42 (N.J. Super. Law Div. 1983) ("The Supreme Court has the power to promulgate rules of administration … and independently, the Chief Justice, as administrative head of the court system, can promulgate binding directives[.]").

De hecho, tal y como se conoce, el ámbito de autoridad administrativa independiente bajo el cual se concibe la figura del Juez Presidente, tanto en Puerto Rico como en Nueva Jersey, llevó a la Convención Constituyente de Nueva Jersey a rechazar una propuesta que pretendía sujetar su poder a la facultad del Tribunal Supremo de adoptar reglas. *Véase* Voorhees Dunn, Arthur T. Vanderbilt's Impact on Judicial Reform at the New Jersey Constitutional Convention of 1947, 29 Rutgers L. J. 731, 754 (1998) ("[t]he tentative draft deviated from the 1942 and 1944 proposals by explicitly restricting the administrative power of the chief justice. Vanderbilt admonished the Committee against making such a change and it subsequently followed his advice and expunged the phrase").

administrativas de "**designar**" y "**asignar**" los jueces a los diversos paneles del Tribunal de Apelaciones. Ello es una afrenta clara a nuestro andamiaje constitucional y la delimitación de poderes que dispuso nuestra Constituyente.

Sin duda, la referida disposición de esta ley violenta la separación de poderes que dimana de la Constitución, pues la Asamblea Legislativa invade zonas administrativas que han sido constitucionalmente reservadas a la Jueza Presidenta como máxima dirigente de la Rama Judicial. Véanse nuevamente, *Pueblo v. Tribunal Superior*, 80 D.P.R. a la pág. 510 n. 4; *Negrón Soto v. E.L.A.*, 110 D.P.R. a la pág. 667.[17]

Ahora bien, el rango constitucional del diseño bajo el cual se estructuró la asignación de jueces y juezas de menor jerarquía en Puerto Rico requiere que ni la Asamblea Legislativa ni tampoco "[e]l Tribunal Supremo [...] pued[an] [...] usurp[ar] las prerrogativas del Juez Presidente de asignar, reasignar y rotar los Jueces del Tribunal de Apelaciones y del Tribunal de Primera Instancia". *Desig. Comité Esp. Secretariado Conf. Jud.*, 131 D.P.R. 526, 528 (1992) (Negrón García, J., *expresión de conformidad*). En otras palabras, aun ante la actuación ilegítima de la Asamblea Legislativa para insertarse en los asuntos administrativos de la Rama Judicial mediante

---

[17] Ya se ha expresado anteriormente por miembros de esta Curia que "resulta cuestionable que la Asamblea Legislativa pueda imponerle al Juez Presidente restricciones a esa facultad constitucional de asignar jueces." *In re Reforma Judicial*, 136 D.P.R. a la pág. 11, n. 2 (Negrón García, J., *voto separado*).

la aprobación de la Ley Núm. 120-2017, es este Tribunal quien está en la mejor posición de salvaguardar y hacer valer el balance de poderes reglamentarios y administrativos entre la Jueza Presidenta y los Jueces Asociados y Juezas Asociadas que surge de la propia Constitución.

No obstante, una mayoría de este Tribunal optó por ignorar su juramento de proteger nuestra Constitución al despojar a la Jueza Presidenta de las prerrogativas administrativas que le concede el Artículo V Sección 7. Esto al eliminarle la facultad de asignar a los jueces a los distintos paneles del Tribunal de Apelaciones y establecer un esquema de asignación rudimentario, vía sorteo manual por tómbola, equivalente a "placing the names of each judge into a hat and selecting three for each sitting".[18] A su vez, cambian el proceso de designación de presidentes de estos paneles, los cuales ejercen una función claramente administrativa, y lo remplazan por un esquema de antigüedad que no toma en consideración las cualidades, destrezas y competencias administrativas y judiciales de los jueces y juezas que ejercerían dicha función. La administración de nuestras cortes es mucho más compleja que esto.

**III.**

---

[18] Marin K. Levy, *Panel Assignment in the Federal Courts of Appeals*, 103 Cornell L. Rev. 65, 73 (2017).

Como se conoce, aun en las jurisdicciones que utilizan elementos aleatorios de asignación, "as one might expect, most courts created their argument panels with some <u>consideration for logistical or efficiency-based factors</u>."[19] Es decir, "[a]lthough it might be tempting in theory to argue that courts should engage in strictly random assignment, such a demand is <u>impossible</u> to satisfy in practice. [...] [M]ost courts simply cannot perform the functional equivalent of pulling names out of a hat for each sitting."[20]

En este sentido, la experiencia federal ilustra que las cortes federales de apelación[21] propiamente "did not employ strictly random panel assignment[.] [...] [T]he various factors they considered when creating panels [...] include: increasing efficiency, enhancing collegiality, and providing special training for new judges."[22]

Al comentar sobre la necesidad de utilizar factores no aleatorios para efectuar la asignación de jueces, la literatura jurídica ha destacado los siguientes a la luz de los estudios efectuados a nivel federal:

---

[19] *Id.* a la pág. 68 (énfasis suplido).

[20] *Id.* a la pág. 94 (énfasis suplido).

[21] Para un estudio a fondo sobre la práctica de asignación en dichas cortes, *véase* Adam S. Chilton & Marin K. Levy, *Challenging the Randomness of Panel Assignment in the Federal Courts of Appeals*, 101 Cornell L. Rev. 1, 1 & 7 (2015) ("Our results provide evidence of nonrandomness in the federal courts of appeals. [...] [T]he assumption that panels are randomly configured in all of the federal courts of appeals is false").

[22] Marin K. Levy, *Panel Assignment in the Federal Courts of Appeals*, 103 Cornell L. Rev. a las págs. 81-82.

**Accommodating Schedules / Managing Logistics**

The most common departure from randomness came from accommodating the scheduling needs and preferences of judges. [...] By and large, these departures were [...] purely logistical. [...]

**Increasing Efficiency**

Related to the general rationale of increasing judicial time, there was at least one departure from random panels based on the goal of efficiency. This departure stemmed from selecting panels to hear cases following a remand. The thought was that if the original panel had put a considerable amount of time into the case during its first iteration at the court, it would save judicial time for those same panel members to decide the case during its second iteration. [...]

**Providing Training**

Two of the circuit courts reported creating special panels for judges in their first year or two on the court, with the goal of providing new judges the experience of presiding. The rationale was that it was helpful for the junior judge to know what it is like to be the lead judge of a panel[.] [...] In two circuits, there has been a tradition of deliberately creating just this type of panel, so as to ensure that each new judge preside within that judge's early time on the court. [...] [...]

**Enhancing Collegiality**

All of the circuit courts surveyed here stated that they tried -- in varying degrees -- to take into account the number of times each judge had sat with every other judge when creating panels. Some of the circuits had precise rules about "co-sits" -- that every judge must sit with every other judge at least some number of times, but no more than some other number of times. Other circuits had no precise rule about co-sits and simply tried to ensure that the judges were "mixed up" every so often. The given rationale for attempting to equalize co-sits was consistent: doing so would enhance the court's collegiality. [...]

**Avoiding Acrimony**

> Related to enhancing collegiality, a few of the judges [...] interviewed mentioned a pair of rarely-used practices aimed at avoiding acrimony between members of the court: allowing individual judges to identify other judges with whom they were unwilling to sit and allowing the chief judge to keep two judges who were at odds with each other from being on the same panel for a limited time. [...] In one circuit, [...] a particular judge [...] made his preferences known to the chief judge, who tried to some extent to accommodate them in creating the argument panels. Doing so, it seemed, would avoid acrimony between judges. [...] The practice of individual judges making panel requests was contrasted with a slightly different practice, in which a chief judge would separate two judges who had recently been at odds. The chief judge would, in effect, give the judges a cooling-off period, and thus would keep them from sitting on the same panel for a limited period of time. One judge volunteered that he thought this practice was on surer footing than the previous one, on the grounds that chief judges have a role in creating a collegial court and avoiding unnecessary acrimony.

**Considering Unusual Events**

> A final group of departures was not associated with any one rationale. Rather, several interview subjects described how particular panels were created for unusual events as if the events themselves necessitated the departure from randomness.

Marin K. Levy, *Panel Assignment in the Federal Courts of Appeals*, 103 Cornell L. Rev. a las págs. 83-91.

Como se puede apreciar, la administración de la justicia eficiente y ordenada exige un ejercicio delicado y acucioso de las necesidades cambiantes de nuestro sistema, para dar una respuesta inmediata y efectiva a las situaciones particulares que todos los días se presentan en nuestros tribunales. Ello incluye pasar juicio sobre la distribución adecuada del trabajo de nuestros jueces, lo

que evidentemente no se promueve con el mecanismo que adopta una mayoría para seleccionar a los presidentes y a los jueces que componen cada panel del Tribunal de Apelaciones en base a criterios que no responden a la sana administración judicial.

La mayoría parece intimar que el descargue de la función de administrar la justicia se lleva a consecución cabal y responsable cuando se sacan nombres de un sombrero. Bajo una bandera de "transparencia", la mayoría confunde la administración con una especie de bingo, donde metemos los números, volteamos la rueda, y vemos qué sale.

Con esta práctica, afrenta el imperativo de considerar factores múltiples, no aleatorios, como la eficiencia, la agilidad y la competencia. Más aún, y en contraste de los métodos para la asignación de jueces que utilizan los foros apelativos de otras jurisdicciones, el sistema aleatorio adoptado no toma en consideración otras variables más complejas y sutiles que meramente los nombres de los jueces que forman parte del sorteo. Por ejemplo, no considera ni cualifica con criterios objetivos del ámbito estadístico las diversidades en experiencia profesional y judicial de los jueces que compondrían cada panel, ni la laboriosidad y agilidad de estos, según los datos que surgen objetivamente de las estadísticas disponibles. Tampoco toma en consideración las relaciones interpersonales y los potenciales conflictos que pueda

suscitar que algunos jueces coincidan en un panel luego de que haya ocurrido un conflicto entre estos.

En fin, la aleatoriedad, por sí sola, no produce resultados correctos.[23] Este tipo de mecanismo es más problemático aun cuando, como ocurre aquí, el esquema que se desarrolla es manipulable por diseño. Fíjese que, aunque las enmiendas reglamentarias mencionan un sorteo, la realidad es que los presidentes de panel no participarán del mismo.[24]

En contraste al sistema aleatorio descrito antes, el mecanismo que se adopta para seleccionar los presidentes de los distintos paneles del Tribunal de Apelaciones se basa, exclusivamente, en el criterio de antigüedad. Ello también tiene el potencial de redundar en que se

_____

[23] Nótese que en pocos contextos se utiliza el uso del azar para sustituir criterios como la eficiencia, competencia o justicia, entre otros. En este sentido, se ha observado:

> **In few other contexts --legal or non-legal-- would one tout the randomness of a body's composition as a virtue when it is selected from a larger group of eligible participants. Coaches do not randomly choose who will play and who will sit on the bench in a given game; participants in academic panel discussions are not determined by lottery. Nor, to turn to other branches of government, are Congressional committees, agency leadership, or other governing groups assigned randomly. In all of these contexts, individuals are selected based on nonrandom characteristics such as their backgrounds and relative competencies.**

103 Cornell L. Rev. a la pág. 95. Sobre la improcedencia de utilizar el azar en contextos adjudicativos, *véase además In re Daniels*, 340 So. 2d 301, 307 (La. 1976) ("[Judge] engaged in conduct in open court that gave the appearance he was deciding the guilt or innocence of defendants upon the toss of a coin. [...] Such unjudicial conduct cannot be condoned."); *Judicial Inquiry & Review Comm'n of Virginia v. Shull*, 651 S.E.2d 648, 657 (Va. 2007) ("Judge [...] concedes that his actions tossing a coin in the courtroom to resolve a visitation dispute were a violation of the Canons".). (Énfasis suplido)

[24] *Véase* enmienda a la Regla 7(a)(3) del Reglamento del Tribunal de Apelaciones. Si la meta era la "transparencia", me pregunto ¿por qué no se sometieron también al sistema de tómbola las presidencias?

configuren paneles desbalanceados e ineficientes en su operación administrativa. Por ejemplo, este mecanismo podría provocar que jueces y juezas que no tengan las destrezas administrativas adecuadas presidan un panel. Ello podría resultar, a su vez, en dilaciones innecesarias en sus trabajos pues les compete a los presidentes velar porque los asuntos referidos a su panel se tramiten de manera diligente y eficiente. En ese contexto, no sería infundado pensar que, según este sistema nuevo, ocasionalmente le corresponderá a un juez con un historial que sugiera deficiencias administrativas, por tener un número abultado de casos pendiente, y que carezca de la reputación para exigir a sus pares mayor eficiencia, velar por esa marcha diligente y adecuada al interior de un panel.

Al sobreestimar el criterio de antigüedad, también se soslaya la experiencia acumulada de los jueces que llegan a ese foro tras un ascenso. Así, un juez de apelaciones que haya sido Juez Administrador en una región judicial del Tribunal de Primera Instancia no podrá aportar su experiencia administrativa en el Tribunal de Apelaciones hasta que alcance la antigüedad necesaria.

De otra parte, el trabajo colegiado en un foro apelativo como el Tribunal de Apelaciones genera tensiones que no son, necesariamente, fáciles de superar. Los integrantes de este Tribunal lo saben. Depender del azar para crear paneles es muy riesgoso si no se deja espacio a

la Jueza Presidenta, como administradora del poder judicial, o al Juez Administrador del Tribunal de Apelaciones por delegación, para hacer las modificaciones que sean necesarias para impedir que, en circunstancias especiales y excepcionales, las relaciones humanas conflictivas dificulten el trabajo colegiado.

Es por eso que, al momento de seleccionar los presidentes de paneles, se deben tomar en consideración otros criterios más allá de la fecha en que juramentó como juez o jueza de apelaciones, tal como su capacidad para mantener un ritmo de trabajo puntual y evitar que los casos se atrasen, así como la habilidad para mediar y lograr que se subsanen las diferencias sustantivas, procesales e interpersonales que surgen en un panel colegiado.[25] Además, no se puede pasar por alto que los

---

[25] Una vez más, la Jueza Asociada señora Pabón Charneco, tergiversa la verdad —por no decir que miente burdamente— en su voto particular de conformidad. Su práctica habitual no es nueva ni sorprendente. Dije entonces y me reafirmo, que duermo tranquila pues nunca he abusado de mi poder para nombrar o asignar jueces. Como muestra un botón basta, les indiqué que miraran la composición actual de los Presidentes de los paneles del Tribunal de Apelaciones, pues durante mis dos años en la Presidencia había nombrado personas basándome en su capacidad administrativa, experiencia laboral, laboriosidad, destrezas para mediar, entre otros elementos, y, ante un comentario que se suscitó, señalé que actualmente hay presidentes de todas las ideologías políticas.

Con relación a la cita al calce número 3 de la Jueza Asociada señora Pabón Charneco destaco que, como suele pasar, el que miente se enreda en su propia mentira. Afortunadamente, la verdad es de fácil corroboración. Contrario a lo que expresa, desde que asumí la presidencia he nombrado cinco nuevos presidentes de panel, los demás fueron nombrados en administraciones pasadas. Pero agradezco a la Jueza Asociada señora Pabón Charneco que corrobore, en blanco y negro, que nunca he discriminado contra nadie, por ningún motivo, confirmando así que lo que siempre me ha guiado es poner a la mejor persona disponible para presidir dichos paneles.

La Jueza Asociada señora Pabón Charneco parece pasar factura por rencillas de antaño. Paso la página de esas historias. Hago la mía. Jueza: la invito a hacer la suya.

presidentes de panel ejercen funciones inherentemente administrativas que por tal naturaleza deben responder al criterio nominador de la Jueza Presidenta, conforme al ordenamiento constitucional reseñado antes.

Pero a fin de cuentas la realidad es que, de antemano, la mayoría de este Tribunal sabe quiénes serán tales presidentes, pues el esquema de antigüedad que han diseñado les permite conocer, *a priori*, los presidentes actuales que saldrán y los nuevos que entrarán. Les adelanto que todos los jueces que ahora entrarán a presidir por primera vez fueron nombrados por el mismo partido que nombró a la mayoría que hoy somete estas enmiendas.[26]

Por otro lado, el sistema propuesto no resolverá necesidades prácticas que atendía el sistema de asignación de jueces hasta hoy vigente. ¿Qué pasará con los paneles cuando ocurra un retiro de un juez? ¿Será necesario echar nuevamente los nombres de los jueces al sombrero? ¿Qué pasará cuando se nominen las personas que ocuparán las dos vacantes que actualmente existen en ese foro? ¿Acudiremos nuevamente a la tómbola?

Como ya mencionamos, la tarea de asignar jueces es una función importantísima de la administración judicial que se delegó constitucionalmente, y de manera exclusiva, en la Jueza Presidenta. La delegación constitucional de esta autoridad no responde a criterios arbitrarios ni

---

[26] Pregúntese ahora si la intención real era la "transparencia".

exógenos a las realidades de nuestro sistema judicial, sino a procurar su funcionamiento ágil y eficiente que resulte en un sistema de justicia de calidad. Después de todo, es esta funcionaria, con el apoyo de la Oficina de Administración de los Tribunales, quien tiene el conocimiento de las necesidades y particularidades administrativas de cada Región Judicial y del Tribunal de Apelaciones.

Por eso la Jueza Presidenta es quien está en mejor posición de tomar decisiones expeditas, para dar respuesta inmediata y efectiva a las situaciones y necesidades particulares que todos los días se presentan en nuestros tribunales. Sin duda, esto incluye la asignación de los presidentes y jueces a los diversos paneles del Tribunal de Apelaciones como una herramienta administrativa para lograr la eficiencia y el mejor funcionamiento posible del foro apelativo intermedio.

En fin, las enmiendas que aprueba la mayoría tienen el efecto de diluir la responsabilidad personal que recaía en la Presidencia dentro del esquema administrativo del poder judicial que surge de la Constitución. Al despojar a la Jueza Presidenta de las facultades administrativas antes mencionadas, deja de existir una figura individualizada que responda y rinda cuentas al país por sus ejecutorias en el proceso de asignación de jueces y juezas a los diversos paneles del Tribunal de Apelaciones.

IV.

Según advertí públicamente cuando se presentó y aprobó --en un plazo de 48 horas-- la Ley Núm. 120-2017: despojar a la Jueza Presidenta de sus facultades administrativas para asignar jueces y juezas a las distintas salas de los tribunales de menor jerarquía es perjudicial para Puerto Rico. Tal actuación atenta contra la independencia judicial en uno de los momentos en que más se cuestiona la misma.

No nos llamemos a engaño, la coyuntura es frágil. Trastocar el funcionamiento de una de las tres ramas de gobierno, actuar con indiferencia y desdén hacia la separación de poderes es peligroso para cualquier democracia. A ello se suma la ineficiencia consecuente en los trámites administrativos.

Reitero, hoy --cuando el azote a nuestra credibilidad es la comidilla de los cibernautas y el tema diario de la prensa-- la mayoría cede ante una de las tentaciones más peligrosas: el poder por el poder mismo, a toda costa, cueste lo que cueste, la Constitución inclusive. Cuando más necesitamos eficiencia y transparencia --esa que no es un mero artilugio-- para salir de la crisis económica y social en la que está sumido Puerto Rico, la mayoría parece decir que todo se vale.

Hoy, más que nunca, este Tribunal debe operar bajo el manto exclusivo de nuestra Constitución, y seguir fielmente el esquema que nuestro ordenamiento fijó para asignar a nuestros jueces.

El País no cree en coincidencias, y tomará con merecida sospecha que justo en este momento una mayoría de este Tribunal haya decidido suprimir la habilidad que históricamente ha tenido la Jueza Presidenta para utilizar criterios objetivos, como experiencia, liderazgo y otros, para asignar a los jueces que vendrán llamados a atender los casos judiciales que se presentan en nuestras cortes.

En vista de ello, y toda vez que considero que este Tribunal no tiene autoridad legal para aprobar un Reglamento que desafía nuestra Constitución con efectos detrimentales en la administración eficiente de nuestro sistema judicial, disiento.

Maite D. Oronoz Rodríguez
Jueza Presidenta

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Enmiendas al Reglamento del Tribunal de Apelaciones y a las Reglas para la Administración del Tribunal de Primera Instancia en atención de la Ley Núm. 120-2017

**Núm.** ER-2018-____

Voto Particular Disidente emitido por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 23 de febrero de 2018

Ya nos decía Cervantes en *El Quijote* que: "La historia es émula del tiempo, depósito de las acciones, testigo de lo pasado, ejemplo y aviso de lo presente, advertencia de lo por venir". Para quienes han estado atentos a la historia reciente de este Tribunal las acciones de hoy no son más que "el aviso de lo presente" del cual nos hablaba el genio de Cervantes. Y esa historia pasada, junto al aviso de lo presente, nos habla y nos advierte de lo que queda por venir.

Mediante la Resolución que hoy se certifica, los integrantes de la mayoría, una vez más, se arrogan poderes inherentemente administrativos de la Presidencia de la Rama Judicial en absoluta contravención al texto de la Constitución que están precisados a defender. Esta última acción es la más reciente tentativa de desmantelamiento de los poderes de la Presidencia ante el fallido intento de tomar por asalto la presidencia misma.[27] Es decir, la mayoría busca controlar ideológicamente la única Rama del

_____

[27] *Véase Torres Montalvo v. Gobernador ELA*, 194 D.P.R. 760 (2016).

gobierno del país cuyo control la historia misma les ha negado.

Una mayoría de este Tribunal se revela incapaz de enfrentarse a la Legislatura, como corresponde, acatando el mandato de una ley contraria a la doctrina de separación de poderes y que trastoca la independencia judicial. Habría que preguntarse qué ocurriría si una ley como ésta se aprobase y la presidencia del Tribunal la ostentase uno de los miembros de la mayoría que hoy la obedece. ¿Votarían para validarla? ¿Aprobarían un reglamento para restarle poderes a ese presidente? La respuesta todos la conocemos. La Asamblea Legislativa -espíritu afín de la mayoría- lo que hace es el trabajo sórdido que permite el continuo asalto ideológico a esta institución.[28]

Cuando en el futuro se escriba y comente sobre el deterioro institucional de la Rama Judicial y de este Tribunal Supremo, se fijará el año 2010 como la fecha de su inicio y, su punto de inflexión, la aprobación de la Ley Núm. 120-2017 y las enmiendas al Reglamento del Tribunal de Apelaciones aprobadas a tenor con ésta. La trayectoria pasada demuestra que, a partir del 2010 y hasta ahora, la ideología política y la adhesión al partido político que les representa van por encima de la Constitución y las Leyes del Estado Libre Asociado de

---

[28]Lo que en el pasado alguien denominó como el "banquete total".

Puerto Rico. Hoy se consolida una verdadera "dictadura imperial"[29] en la que el fin justifica los medios.

El paso del Huracán María sobre nuestro País puso de relieve, entre otras cosas, los efectos nocivos de la politiquería sobre una corporación pública que, en sus inicios, fue un modelo de administración pública. Me refiero, claro está, a la antigua Autoridad de Fuentes Fluviales, hoy Autoridad de Energía Eléctrica. La ineficiencia que observamos en el desempeño de esta corporación pública no es más que el reflejo de décadas de ese proceso de politización y del afán desmedido de las ramas políticas por controlar las corporaciones públicas y agencias gubernamentales bajo el fundamento de que *a los vencedores se llevarán el botín*.

Esa mentalidad implica que en las entidades asaltadas el criterio rector de nombramiento, reclutamiento, retención y evaluación responda a la adhesión al partido y sus postulados y no a un compromiso cabal con la entidad en la que se desempeñan y los servicios que se ofrecen al País. La reglamentación aprobada hoy, y la que está por venir, nos coloca en esa vía resbaladiza de politización, burocratización e ineficiencia.

Quienes intenten minimizar estos eventos arguyendo que se trata meramente de una intrascendente "lucha de poder", se equivocan. El proceder de la mayoría socava los cimientos mismos de la democracia. La democracia no es un mero formalismo moral o jurídico. La democracia, como

---

[29] Véase In re Aprob. Rs. Y Com. Esp. Ind., 184 D.P.R. 575 (2012).

valor universal, es un elemento imprescindible para preservar y desarrollar viejos y nuevos derechos. Esa idea, y las prácticas que la comprenden, se asientan sobre un conjunto de reglas, convivencias sociales e instituciones que no sólo potencian la democracia misma, sino que, en tiempos de crisis, la protegen. Una de esas instituciones es sin duda el Poder Judicial, pero no cualquier poder judicial, sino aquél que es independiente, imparcial y neutral. Sólo un poder judicial que goce de estas características puede ser árbitro neutral y justiciero de las controversias que surgen como resultado de vivir en sociedad. Se subvierte la democracia "[by] packing and "weaponizing" the courts and other neutral agencies,. . . and rewriting the rules of politics to tilt the playing field against opponents . . . " Steven Levitsky & Daniel Zieblatt, *How Democracies Die*, en la pág. 5 (2018).[30]

El *empaquetamiento ideológico* de la judicatura supone el aniquilamiento paulatino y eventual de nuestra democracia. En momentos como éstos no podemos enmudecer. Es con gran pesar que debo condenar la acción de la mayoría de, nuevamente, descartar el texto constitucional claro para adelantar su interés de tomar control político partidista de la Rama Judicial. Llana y sencillamente, de esto trata esta resolución. La tinta vertida para decir lo

---

[30] Véase también, Héctor Luis Acevedo, Los árbitros de la democracia,https://www.elnuevodia.com/opinion/columnas/los arbitosdelademocracia-columna-2399616/, última visita 19 de febrero de 2018.

contrario, es sólo una forma poco ingeniosa de explicar el proceder mayoritario.

El curso de acción tomado por una mayoría demuestra, además, que su *modus operandi* al tratar de imponerse y deteriorar esta institución se distingue invariablemente por el secretismo, la premeditación concertada, los preacuerdos a puerta cerrada, el rechazo a la divergencia de criterio, así como por una celeridad sorprendente y de ordinario atípica en la descarga usual de sus faenas judiciales.

## I

Durante la tarde del martes, 13 de febrero de 2018, específicamente a las 5:38 p.m., el Juez Asociado señor Martínez Torres circuló un memorando acompañado por sus propuestas de enmiendas al Reglamento del Tribunal de Apelaciones y un nuevo reglamento para la Comisión de Evaluación Judicial. En su misiva, el Juez Asociado también explicó que, dado que la Ley 120-2017 derogó las disposiciones legales atinentes a la Comisión de Evaluación Judicial y encomendó al Pleno del Tribunal la redacción de nueva reglamentación, había preparado una propuesta a tales fines. Por último, el Juez Asociado señor Martínez Torres solicitó que, en el Pleno a celebrarse el viernes 16 de febrero de 2018, se incluyeran ambos asuntos. Reconoció que hacía esa solicitud a menos de diez días de la reunión –a dos días para ser exactos– y que entendía que necesitaría contar con el aval de una mayoría para incluirlos en la agenda.

A la mañana siguiente, en menos de cinco horas, el Juez Asociado recibió el aval de cuatro integrantes de este Foro para que el asunto se incluyera en la agenda de la reunión de Pleno pautada. Un Juez Asociado, incluso, expresó su conformidad con las enmiendas, sin más. Así, aquéllos que deseáramos estudiar detenidamente las enmiendas y la reglamentación propuesta para una discusión plenaria informada y ponderada, estábamos obligados a estudiar la proveniencia, funcionalidad y deseabilidad de su implementación en tan sólo un día. Ello es así porque, como bien sabíamos todos, para el día anterior a la referida reunión de Pleno estaba pautada la juramentación de la nueva clase togada. La Jueza Presidenta, en particular, atiende los pormenores de esta actividad y es quien juramenta formalmente a los nuevos abogados y abogadas que allí se citan.

El trámite expedito y atropellado que se reseña en los párrafos que anteceden no es más que otra digresión de los procedimientos que han de imperar en un foro colegiado y un ejemplo más del laborioso empeño de una mayoría de imponerse y controlar aspectos de la Rama Judicial del todo incompatibles con sus responsabilidades y deberes como Jueces y Juezas Asociados. Después de todo, si como cuestión de hecho cuentan con una mayoría, ¿por qué la prisa?; ¿por qué la aprensión al análisis sosegado y la discusión informada?; ¿por qué la predeterminación y la prepotencia?; ¿por qué rehuir a los procedimientos establecidos para la consideración de asuntos tan importantes por el Pleno del Tribunal?; ¿por qué tomar la

vía rápida si, como alegan, están facultados constitucionalmente en su proceder?[31] Claramente estábamos ante un documento que había sido objeto de discusión privada entre los miembros de la mayoría y la "discusión" propuesta era un mero formalismo inconsecuente.

Resulta imposible elucidar respuestas coherentes a estas interrogantes. Lo que sí queda claro es que todas evidencian la farsa que protagonizan cinco miembros de este Tribunal y su obstinada afición al poder que no tiene otro efecto que mancillar los cimientos de una institución que procura garantizar los valores más preciados de una democracia constitucional. Así, el curso de acción de una mayoría sólo se fundamenta en el absurdo de que su poder de reglamentación es extensible a la administración de la Rama Judicial, poder que expresamente la Constitución delega a la Jueza Presidenta. Esto es, **ante la no delegación del poder de administrar, pretenden, mediante reglamentación, arrogarse funciones puramente administrativas que no les competen**. Esta auto delegación, además de ser inconstitucional, supone la burocratización del funcionamiento de la Rama Judicial mediante el fraccionamiento inadecuado de decisiones y actuaciones administrativas habituales que, acorde con el diseño

---

[31] Como testigo de lo pasado, la historia nos remite irremediablemente a otras instancias en las que una mayoría de este Tribunal ha recurrido al atropello, la prepotencia y la autocracia para lograr sus propósitos y acequiarse poder y autoridad sobre la Rama Judicial. *Véase In re Solicitud Aumentar Núm. Jueces TS*, 180 D.P.R. 54 (2010); *In re Aprob. Rs. Y Com. Esp. Ind.* 184 D.P.R. 575 (2012).

constitucional y la práctica y costumbre de este Tribunal, recaen propiamente en la figura de la Jueza Presidenta.

## II

La Sección 7 del Artículo V de nuestra Constitución dispone lo siguiente:

> El Tribunal Supremo adoptará reglas para la administración de los tribunales las que estarán sujetas a las leyes relativas a suministros, personal, asignación de fondos, y a otras leyes aplicables en general al gobierno. El Juez Presidente dirigirá la administración de los tribunales y nombrará un director administrativo, quien desempeñará su cargo a discreción de dicho magistrado.

Const. P.R., Art. V, Sec. 7.

Según se desprende diáfanamente de la disposición constitucional precitada, le corresponde a la Jueza Presidenta administrar los tribunales y al Tribunal, en pleno, adoptar las reglas para la administración de éstos. El texto de la disposición claramente distingue los poderes de reglamentar y administrar, explícitamente delegando las funciones administrativas a la Jueza Presidente. Es decir, nuestra Constitución no sólo crea la figura del Juez Presidente como una de carácter distinto al resto de los Jueces Asociados sino que, además, expresamente divide las funciones que le competerán a cada uno de ellos.

El historial del referido precepto constitucional deja claro que nuestros constituyentes en ningún momento vislumbraron que el poder de reglamentar delegado al Pleno del Tribunal podría utilizarse en menoscabo de las funciones inherentemente administrativas que le corresponden al Juez Presidente. De hecho, la Comisión de

la Rama Judicial delimitó esas funciones como las siguientes:

(1) Compilar estadísticas y preparar informes.
(2) Alquilar locales, comprar y proveer equipo y servicios.
(3) Conceder licencias y vacaciones a funcionarios y empleados.
(4) Investigar quejas y formular cargos, ante la autoridad correspondiente, contra funcionarios y empleados.
(5) Autorizar desembolsos dispuestos por ley y revisar las cuentas de todos los tribunales.
(6) **Asignar y trasladar jueces.**
(7) **Aprobar reglamentos para las distintas cortes.**
(8) **Superentender en los tribunales.**

*Diario de Sesiones de la Convención Constituyente, Tomo 4, Informe de la Comisión de la Rama Judicial*, en la pág. 2613 (énfasis suplido).

Si bien los delegados de la Convención Constituyente reconocieron que sería "el Tribunal Supremo quien adoptará reglas para la administración de los tribunales", *Diario de Sesiones*, Tomo 3, en la pág. 1669, tal pronunciamiento no implica que, mediante esa reglamentación, se puedan delegar al pleno del Tribunal poderes administrativos. Incluso, al discutir la figura del director administrativo, algunos delegados manifestaron su preocupación respecto a la continuidad de la posición ante un cambio en la presidencia del Tribunal. Específicamente, el Sr. Padrón Rivera propuso cambiar el texto de la Sección 7 para que el director administrativo se desempeñara en su cargo "mientras observe buena conducta" y no a discreción del Juez Presidente. *Id.* en la pág. 1666. Según explicó el delegado, la enmienda buscaba proteger al director administrativo en su posición.

El Sr. Ramos Antonini se opuso a la enmienda, explicando que el propósito de la Sección 7 era "el de que

la responsabilidad de la administración de los tribunales recaiga en el presidente del Tribunal Supremo". *Id.* en la pág. 1667. Así, razonó que una enmienda que le impusiera al Juez Presidente la obligación de mantener al director administrativo en funciones le negaba "la autoridad que corresponde a la responsabilidad que le estamos fijando". *Id.* en la pág. 1668. El delegado explicó que la atención a esta propuesta de enmienda debía fijarse "en la responsabilidad y en la autoridad del Juez Presidente" y que no debían "coartar su libertad para su eficiencia mediante esta enmienda". *Id.* en la pág. 1668. Al analizar esta enmienda, el delegado Ramos Antonini también señaló que la dirección de los tribunales por parte del Juez Presidente buscaba proteger "al poder judicial, en el sentido de garantizarle eficiencia en su funcionamiento por su administración". *Id.* en la pág. 1667.

Luego de que la enmienda fuese derrotada, y aún preocupados por la figura del director administrativo, el delegado Valentín Vizcarrondo propuso que el director administrativo estuviese sujeto a un reglamento aprobado por el Juez Presidente y no a la discreción de éste. El delegado Ramos Antonini también se opuso a esta enmienda, explicando que la misma nuevamente ponía el énfasis en la figura del director administrativo "en detrimento de la personalidad del Juez Presidente, a quien se le dice 'usted será responsable de la administración de justicia en Puerto Rico'". *Id.* en la pág. 1668.[32] Señaló, además,

---

[32] Nótese que, al igual que ocurre con las enmiendas que hoy se aprueban, lo que se estaba proponiendo reglamentar

que esa enmienda supondría una contradicción, puesto que permitiría al Juez Presidente crear un reglamento, función que le competía al Pleno del Tribunal. Al señalar esto, propuso, para efectos de argumentación, variar la enmienda para que fuese el pleno del Tribunal el que creara un reglamento que rigiera la posición de director administrativo. Según consideró el delegado Ramos Antonini, ello implicaría una intromisión indebida del pleno del Tribunal en el poder de administrar del Juez Presidente, puesto que el puesto de director administrativo era "un cargo de confianza, eminentemente de confianza". *Id.* en la pág. 1670.

De lo anterior se desprende con patente claridad que la enmienda en cuestión fue descartada justamente en atención al poder de administración delegado al Juez Presidente, puesto que los delegados entendieron más adecuado que el director administrativo no estuviese sujeto a un reglamento creado por éste ni por el pleno del Tribunal, sino más bien, como finalmente quedó aprobado el texto de la sección que el director administrativo sirviera, "a discreción" del Juez Presidente. Es decir, los delegados determinaron que quien asistiría al Juez Presidente en la descarga de sus funciones como administrador de los tribunales debía estar exento de reglamentación por parte del pleno del Tribunal. Ello, puesto que el poder de administrar no le fue delegado al pleno de este Foro y la selección y retención del director

---

era la discreción del Juez Presidente en el ejercicio de su rol como administrador de los tribunales.

administrativo era indispensable para que el Juez Presidente ejerciera eficientemente su poder de administrar la Rama Judicial.

El diálogo que se suscitó en la Convención Constituyente respecto a la enmienda propuesta para sujetar al director administrativo de los tribunales a un criterio distinto a la discreción del Juez Presidente contradice la interpretación acomodaticia y descontextualizada de la mayoría de la Sección 7 del Artículo V de la Constitución. En todo caso, las expresiones allí vertidas reafirman que el poder de administración no debe estar sujeto a reglamentación por parte del pleno, puesto que únicamente le pertenece al Juez Presidente. Así, los delegados estimaron inadecuado que el pleno del Tribunal incidiera en la designación, desempeño y evaluación de la persona que asistiría al Juez Presidente en su rol de administrador de la Rama Judicial. Claramente, este diálogo ilustra que el poder de reglamentar delegado al Pleno es uno limitado y no se extiende a aspectos relacionados con la administración de la Rama Judicial.

De otra parte, el Comité para el Estudio y Evaluación del Sistema Judicial, en su informe sobre la administración de los tribunales, diferenció el poder de administrar delegado al Juez Presidente del poder de reglamentación conferido al pleno del Tribunal. A esos efectos, el Comité destacó lo siguiente:

> También debe el Juez Presidente compartir con los jueces asociados las labores de adjudicación y de formulación de reglas de modo que él tenga

suficiente oportunidad para dedicarse a la dirección ejecutiva de la Rama Judicial, la cual puede ser objeto de asesoramiento por parte de los jueces asociados o del Tribunal en pleno **pero no compartirse en forma colegiada. La Constitución y las propias condiciones inherentes a la dirección administrativa requieren que la responsabilidad resida en el Juez Presidente como último centro de autoridad.**

*Comité para el Estudio y Evaluación del Sistema Judicial, Informe al Tribunal Supremo de Puerto Rico sobre la Oficina de Administración de los Tribunales*, en la pág. 6 (1965).

Es decir, la formulación de reglas es una labor que compete al Pleno del Tribunal, pero la administración de la Rama Judicial le compete únicamente al Juez Presidente. De esta forma, decisiones relacionadas con la dirección ejecutiva de los tribunales no están sujetas al proceso colegiado al que sí están sujetos aspectos relacionados con la reglamentación.

Por último, conviene evaluar, si bien brevemente, la procedencia de la Sección 7 de nuestra Constitución, en tanto y cuanto ésta emula disposiciones estatales y federales que también distinguen la reglamentación de la administración y delegan esta última en la figura del Juez Presidente. A nivel federal, el Juez Presidente del Tribunal Supremo de los Estados Unidos es también el administrador de las cortes. Con relación a la administración de las cortes inferiores, le corresponde al Juez Presidente designar y reasignar temporeramente a cualquier juez de una corte de circuito a otro circuito. *Véase* 28 U.S.C. sec. 291(a). Además, el Juez Presidente está facultado para asignar cualquier ex Juez Presidente o ex Juez Asociado del Tribunal Supremo a servir en una

corte de circuito. *Véase* 28 U.S.C. sec. 294(a). *Véase además* Denis Steves Rutkus & Lorraine H. Tong, *The Chief Justice of the United States: Responsibilities of the Office and Process for Appointment* (Rev. 2005).

En Nueva Jersey, otro estado que sirvió de precedente para la delegación de poderes administrativos en la figura del Juez Presidente, algunas funciones administrativas relacionadas con la administración de los tribunales inferiores comprenden: (1) la división del estado en zonas geográficas que propendan la administración más eficiente de la justicia; (2) la designación de salas en cada una de esas divisiones geográficas; (3) la selección de un juez de asignación que administre cada división geográfica y se encargue de la designación de jueces para las salas, y (4) el nombramiento de jueces presidentes para cada sala. *Véase* Rules Governing the Courts of the State of New Jersey, R. 1.33.

De igual manera, en California, otro estado que sirvió de ejemplo para el diseño de nuestro esquema de administración judicial, la Constitución dispone que la Jueza Presidenta está encargada de la asignación de jueces a las divisiones apelativas de cada corte superior. *Véase* Const. Cal., Art. VI, sec. 4. Situación similar ocurre en los estados de Maryland y Kentucky en los cuales se designa al Juez Presidente como administrador de los tribunales y se le delega a éste la facultad de asignar jueces a distintos tribunales inferiores en casos de

necesidad. *Véanse* Const. MD Art. IV, sec. 18[33]; Const. KY, sec. 110, 5(b)[34].

Además de emular el modelo de administración judicial del gobierno federal y de otros estados, nuestros constituyentes también consideraron el escrito de Roscoe Pound reseñando la historia de la organización de las cortes y proveyendo alternativas y principios para una estructura más eficiente y organizada. En *Organization of the Courts*, Roscoe Pound recomendó que:

> Supervision of the judicial-business administration of the whole court should be committed to the Chief Justice, who should be made responsible for the effective use of the whole judicial power of the state. Under rules of court he should have authority to make reassignments or temporary assignments of judged to particular branches or divisions or localities according to the amount of work to be done and the judges at hand to do it.[35]

---

[33] Esta sección establece lo siguiente:
> The Chief Judge of the Court of Appeals shall be the administrative head of the Judicial system of the State. The Chief Judge of the Court of Appeals shall from time to time require, from each of the judges of the Circuit Courts, of the District Court and of any intermediate courts of appeal, reports as to the judicial work and business of each of the judges and their respective courts. . . [T]he Chief Judge of the Court of Appeals may, in case of a vacancy, or of the illness, disqualification or other absence of a judge or for the purpose of relieving an accumulation of business in any court assign any judge except a judge of the Orphans' Court to sit temporarily in any court except an Orphans' Court.

[34] Esta sección establece lo siguiente:
> The Chief Justice of the Commonwealth shall be the executive head of the Court of Justice and he shall appoint such administrative assistants as he deems necessary. He shall assign temporarily any justice or judge of the Commonwealth, active or retired, to sit in any court other than the Supreme Court when he deems such assignment necessary for the prompt disposition of causes. The Chief Justice shall submit the budget for the Court of Justice and perform all other necessary administrative functions relating to the court.

[35] En la misma línea, los estándares de organización del American Bar Association, publicados décadas después del

Roscoe Pound, *Organization of Courts,* en la pág. 284 (1940).

Nótese que la recomendación de Pound toma en cuenta el poder de reglamentación que ostenta el pleno del Tribunal al afirmar que será éste el que reconocerá, mediante reglamentación a esos efectos, el poder decisional para la reasignación temporera de jueces y juezas. Algo muy distinto es que el pleno del Tribunal, mediante reglamento a esos efectos, se arrogue indebidamente ese poder o despoje al Juez Presidente del mismo. La distinción es importante, porque, como se discute posteriormente, la asignación de personal y recursos dentro del sistema judicial muchas veces requiere acción inmediata y, a su vez, depende de la evaluación de múltiples factores relacionados con la sana y eficaz administración de la justicia.

---

estudio de la organización del sistema de justicia de Roscoe Pound, se reconoció lo siguiente en cuanto al rol del Juez Presidente como administrador de la Rama Judicial:

> The Chief Justice must serve as leader and active member of the highest court, although his responsibility for preparing opinions as a member of the court may have to be adjusted to allow time for his public and supervisory duties. The administrative responsibilities of the chief justice cannot be exhaustively catalogued, for they extend to actual or potential involvement in every activity of the court system. However, they can be summarized under four general headings: general management of people; general management of money; chief spokesman for the system; and general superintendence of the staff of administrative personnel by and through whom the direct activity of administration is chiefly carried out.

American Bar Association, Standards Relating to Court Organization, en las pags. 83-84 (1974).

Roscoe Pound justamente resalta la necesidad de que ese tipo de determinaciones puramente administrativas le correspondan al Juez Presidente. En cuanto a la responsabilidad en torno a la asignación de jueces, destaca que "[d]ivided responsibility is no responsibility. Concentration of responsibility in a Chief Justice with corresponding power will correct, indeed will compel correction of, many abuses which have grown up because no one had the responsibility for preventing or removing them." *Id.* en la pág. 290.

Conviene aclarar que el poder presidencial de administrar no se ejerce en el vacío y con independencia del poder de reglamentación delegado constitucionalmente al pleno del Tribunal. El problema surge, sin embargo, cuando la reglamentación que procura aprobar el pleno tiene el propósito de despojar al Juez Presidente de funciones eminentemente administrativas, como ocurre con las enmiendas al Reglamento del Tribunal de Apelaciones que son objeto de la resolución que hoy certifica una mayoría.

Las enmiendas que hoy se aprueban son precisamente un ejemplo de cómo, mediante un reglamento, una mayoría de los integrantes de este Tribunal ha decidido incidir indebidamente en la asignación de casos y jueces en el Tribunal de Apelaciones. Ello, sin ningún fundamento que justifique las enmiendas y exclusivamente motivados por el reconocimiento legislativo de su poder constitucional de reglamentar, según lo dispuesto en la Ley Núm. 120. Irónicamente, una mayoría sustenta su represible curso de

acción en legislación que, a todas luces, contraviene la doctrina de separación de poderes y constituye una afrenta de la legislatura de turno a la independencia judicial.

## III

Durante el transcurso del breve trámite conducente a la aprobación de la Ley Núm. 120 y su firma por el Gobernador, tanto la Jueza Presidenta de este Tribunal como académicos distinguidos de la comunidad jurídica del País se expresaron en torno a sus visos de inconstitucionalidad. Algunos estimaron que se trataba de una "intervención indebida de la Asamblea Legislativa en los asuntos internos de la Rama Judicial". Efrén Rivera Ramos, *Reforma judicial precipitada*, El Nuevo Día, 19 de diciembre de 2017. Otros opinaron que la Ley suponía un ejercicio indebido por parte de la Legislatura de la facultad de "reglamentar a la Rama Judicial por vía legislativa" y advirtieron que nada impedía que, en el futuro, se reglamentara de otra manera "según los designios de la Asamblea Legislativa de turno". Andrés L. Córdova, *Las enmienda a la Ley de la Judicatura*, 21 de diciembre de 2017, El Vocero. En atención a ello "desde la perspectiva de la separación de poderes, esto es impermisible". *Id.*

De particular relevancia a la resolución que hoy se certifica, uno de los aspectos más polémicos de la Ley Núm. 120 es la delegación que hace ésta al pleno del Tribunal del poder de designar y asignar jueces a los diversos paneles del Tribunal de Apelaciones "de

conformidad con las reglas de administración que adopte a esos efectos". Ley Núm. 120 de 15 de diciembre de 2017, Art. 6. Asimismo, la Ley Núm. 120 dispone que la Asamblea Legislativa "recomienda que dichos procesos de asignación de jueces se hagan con criterios objetivos o con mecanismos aleatorios que aseguren la transparencia e imparcialidad". *Id.* Según la Ley, también le corresponderá al pleno "modificar tales asignaciones, según surja la necesidad para ello" y de "designar jueces de un nivel a ejercer la competencia de jueces de otro nivel, "de conformidad con las normas o reglas de administración que adopte a tales efectos". *Id.*

La extralimitación de la Rama Legislativa en sus poderes que representa la aprobación de esta Ley es incuestionable. No hay que ser un estudioso del Derecho Constitucional para entrever que lo que está haciendo la Asamblea Legislativa es reglamentando la manera en la que se administrará la Rama Judicial. Si este mandato no constituye una intromisión indebida del poder legislativo en el poder judicial, resulta difícil entender, con el beneficio del paso del tiempo, aquellas expresiones suscritas por una mayoría relacionadas a cómo una ley aprobada por la legislatura que transgredía su "poder inherente" de reglamentar la profesión era inconstitucional por violentar la doctrina de separación de poderes. *Véase Rivera Schatz v. ELA y C. Abo. PR II*, 191 D.P.R. 791 (2014).

Curiosamente, en este caso, mediante la Ley Núm. 120, la legislatura regula aspectos relacionados con la

administración de la Rama Judicial, lo que no constituye un "poder inherente", sino uno **expresamente delegado por la Constitución a la Jueza Presidenta**. Una mayoría, sin embargo, se aparta del precedente pautado en *Rivera Schatz*, *supra* y, en lugar de no obedecer un mandato legislativo que menoscaba sus poderes, lo acata sin reserva alguna. Todo indica que, al parecer, los movimientos provocados por "el flujo normal de la marea judicial" son cada vez más inconsistentes, si bien crecidamente predecibles.

Los cambios que hoy se realizan al Reglamento del Tribunal de Apelaciones no son más que un intento burdo de la mayoría, inducida por la legislatura de turno, de usurpar el poder de administración de los tribunales mediante el ejercicio inadecuado su poder reglamentador. Bajo el pretexto de lograr una mayor transparencia y aleatoriedad en la asignación de casos y jueces en el foro apelativo intermedio, y sin ninguna evidencia para mostrar que el sistema actual sea ineficiente, una mayoría ignora la complejidad de este proceso y lo aborda como un simple juego al azar que, en función de probabilidades calculadas, le permitirá a ellos y a aquellos afín con su ideología política perpetuarse en el poder. Veamos.

**IV**

En esencia, las enmiendas propuestas al Reglamento del Tribunal de Apelaciones alteran los procedimientos establecidos para la administración y funcionamiento de ese tribunal en todo lo relacionado con la asignación y

reasignación de recursos y la designación de paneles para atender los mismos. Como se anticipó, el proceso de asignación de jueces y juezas a un panel es uno complejo que, necesariamente, debe tomar en consideración factores subjetivos tales como capacidad, laboriosidad, experiencia, peritaje, metodología adjudicativa y experiencia administrativa y gerencial, entre otros. En última instancia, la designación de los distintos paneles debe procurar promover una diversidad experiencial que permita un acercamiento heterogéneo a la resolución de controversias jurídicas y que promueva la discusión y la evaluación de distintos puntos de vista del Derecho aplicable.

En lo relacionado con la designación de Jueces y Juezas que presidirán los distintos paneles del Tribunal de Apelaciones, facultad que le correspondía a la Jueza Presidenta, la nueva regla establece que tal designación se hará tomando en cuenta únicamente el criterio de antigüedad. Ese "orden estricto de antigüedad" al que alude la regla podría en cualquier otro contexto, representar un criterio completamente objetivo. No obstante, un análisis de la composición actual del Tribunal de Apelaciones permite entender que, en la práctica, serán la mayoría de los Jueces y Juezas nombrados por el Partido Nuevo Progresista aquellos que satisfarán ese criterio. Así, la mayoría – si no todos- los paneles del Tribunal de Apelaciones serán presididos por un Juez de una ideología política particular.

Como muestra ulterior del compromiso ineludible de una mayoría con la transparencia y la aleatoriedad en la administración de la justicia, el nuevo sistema establece un proceso para la determinación de los otros Jueces y Juezas que compondrán los referidos paneles. Este proceso consiste en "la celebración de un sorteo en que se colocarán en una tómbola todos los nombres de los Jueces y Juezas del Tribunal de Apelaciones que no presiden Paneles". Para garantizar la solemnidad y publicidad de ese sorteo, la enmienda dispone que "deberá levantarse un acta notarial" y que el sorteo estará abierto al público general.[36] El proceso instituido busca la imparcialidad en la designación de estos Jueces y Juezas. La justicia, sin embargo, no puede administrarse como una terna romana o un juego de azar.

Consideraciones como la capacidad para el manejo de casos complejos, el área de peritaje, la experiencia con distintos tipos de casos y la metodología adjudicativa son sólo algunos de los criterios que han de tomarse en cuenta al momento de determinar la composición de un grupo que revisará las determinaciones judiciales de los tribunales de primera instancia. Igual, para quienes en el pasado hemos fungido como administradores de complejos organismos, sabemos que, al evaluar la composición de un grupo de trabajo, tenemos que tomar en cuenta la dinámica interna de los integrantes del grupo para asegurarnos así

---

[36] Quizá por descuido o por la premura en la que se aprobaron las enmiendas, no se establece si el evento también será transmitido por los medios televisivos del País de manera simultánea a los sorteos del *Powerball* y el Pega 3.

su mayor efectividad. No vale argüir, sin más, que "tienen que trabajar en conjunto", pues no estamos ante una tropa de niñas escuchas o una manada de cobitos que obedece ciegamente a su dirigente. Si bien "la vida es una tómbola"[37], la justicia no debería serlo.

Porque en algún momento coincidí con la sensatez y lucidez de una mayoría al reconocer que "el Juez Presidente tiene funciones constitucionales expresas que no tienen los Jueces Asociados del Tribunal Supremo", *Torres Montalvo v. Gobernador ELA*, 194 D.P.R. 760 (2016), hoy disiento. El frenesí y la obstinación por arrogarse poder y perpetuarse en él a toda costa es un presagio más del desvanecimiento inminente de la Rama Judicial. El paso del tiempo corroborará que las acciones que hoy toma una mayoría son, lamentablemente, "una advertencia de lo por venir".


                              Anabelle Rodríguez Rodríguez
                              Juez Asociada

---

[37] *Véase* Marisol – Tómbola, YouTube (21 de febrero de 2018), https://www.youtube.com/watch?v= QDmu3UpDtZE.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Aprobación de Enmiendas al
Reglamento del Tribunal de       ER-2018-1
Apelaciones

Voto Particular Disidente emitido por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico a 23 de febrero de 2018.

Hoy, una vez más, las ansias desmedidas de poder, que nos carcomen como país, y que tanto daño nos han hecho como sociedad, se apoderan de este sagrado recinto. Tan pronto avisté su presencia -- más o menos para comienzos de este mes de febrero de 2018, fecha en que una exigua mayoría de este Tribunal solicitó la discusión de ciertas "*Enmiendas al Reglamento del Tribunal de Apelaciones y a las Reglas para la Administración del Tribunal de Primera Instancia en atención a la*

*Ley Núm. 120-2017"*[38] -- decidí hacerle frente. El exceso de poder y quien suscribe nunca hemos sido amigos. No lo necesito. Siempre he sabido vivir con lo que tengo, sea poco o sea mucho. En mi faceta profesional -- esos principios que han guiado mis pasos por el camino de la vida -- no han sido ni serán distintos.

Allá para el 5 de julio de 2016, juré como **Juez Asociado del Tribunal Supremo de Puerto Rico,** no como Juez Presidente de este Tribunal. En ese momento de la historia, ya conocía que la ingente tarea de dirigir los destinos de la Rama Judicial de Puerto Rico había recaído en la compañera Jueza Presidenta Hon. Maite D. Oronoz Rodríguez. Ese dato también lo conocían mis compañeros Jueces Asociados y mis compañeras Juezas Asociadas.

Así las cosas, al momento de jurar como Juez Asociado, sabía al detalle cuáles eran mis funciones en este Foro y cuáles no. La Constitución del Estado Libre Asociado de Puerto Rico, en ese aspecto, es en extremo clara. La administración de la Rama Judicial recae en la Jueza Presidenta. A los Jueces Asociados y Juezas Asociadas de este Tribunal nos compete colaborar en esas tareas -- no apropiarnos de las mismas -- y dedicarnos, como últimos intérpretes de la Constitución, a la adjudicación de los casos y controversias que día a día se presentan ante nuestras puertas.

---

[38] El propósito de las referidas enmiendas, entre otros, era despojar a la Jueza Presidenta de sus poderes constitucionales de asignar jueces y juezas a los distintos Paneles del Tribunal de Apelaciones y transferir esa facultad al Pleno del Tribunal.

Sobre el particular, basta con repasar lo dispuesto en el Art. V, Sec. 7, de la Constitución del Estado Libre Asociado de Puerto Rico, el cual, en esencia, establece que:

> El Tribunal Supremo adoptará reglas para la administración de los tribunales las que estarán sujetas a las leyes relativas a suministros, personal, asignación y fiscalización de fondos, y a otras leyes aplicables en general al gobierno. **El Juez Presidente dirigirá la administración de los tribunales** y nombrará un director administrativo, quien desempeñará su cargo a discreción de dicho magistrado. (Énfasis suplido) Art. V, Sec. 7, Const. E.L.A., Tomo 1, Ed. 2016, pág. 431.

Como se sabe, la mencionada disposición constitucional fue el resultado de un análisis consiente y coherente realizado por los padres de nuestra Constitución, y recopilado en el Diario de Sesiones de la Convención Constituyente, sobre la mejor forma de proteger la eficiencia y el adecuado funcionamiento de la Rama Judicial; características esenciales de un buen sistema democrático de gobierno. 1 Diario de Sesiones de la Convención Constituyente 452-453 (1962).[39]

En esa dirección, y en lo pertinente al asunto que nos ocupa, se señaló sin ambages que el propósito de la referida cláusula constitucional era *"que la*

---

[39] Así surge del debate aunado en el Diario de Sesiones de la Convención Constituyente, y en específico del Informe de la Comisión de la Rama Judicial rendido el 28 de noviembre de 1951, en momentos en que se daba paso a la propuesta de trasladar los poderes de administración judicial que, en ese entonces, estaban en manos del Procurador General a la Rama Judicial, y en particular al Juez(a) Presidente(a). A juicio de los miembros de la referida Comisión, al trasladar los poderes de administración de los tribunales a la Rama Judicial se trasladaban al lugar *"donde debe[n] estar"*, sin intervención por parte de otras ramas del gobierno. 1 Diario de Sesiones de la Convención Constituyente 453 (1962). Ello, pues *"el propósito de eficiencia en la organización y funcionamiento de la rama judicial, está íntimamente vinculado y depende fundamentalmente […] de la independencia del poder judicial"*. *Íd.*, a la pág. 452.

*responsabilidad de la administración de los tribunales de justicia reca[yese] en el presidente del Tribunal Supremo".* 3 Diario de Sesiones de la Convención Constituyente 1667 (1962). **Respecto a en qué consistía la *"administración"* de los tribunales, la Comisión de la Rama Judicial fue contundente e hizo constar en su *Informe* que el término comprende, sin que se entendieran excluidas otras similares y análogas, las siguientes funciones:** (1) compilar estadísticas y preparar informes; (2) alquilar locales, comprar y proveer equipo y servicios; (3) conceder licencias y vacaciones a funcionarios y empleados; (4) investigar quejas y formular cargos, ante la autoridad correspondiente, contra funcionarios y empleados; (5) autorizar desembolsos dispuestos por ley y revisar las cuentas de todos los tribunales; (6) **asignar y trasladar jueces;** (7) aprobar reglamentos para las distintas cortes; y (8) supervisar los tribunales. 4 Diario de Sesiones de la Convención Constituyente 2613 (1962). Hoy, precisamente, algunas de esas facultades constitucionales de la Jueza Presidenta son las que, de un plumazo, se le quieren arrebatar.

Por eso, al percatarme de la intención de una mayoría de este Tribunal de -- a través de una acomodaticia interpretación constitucional -- tomar por asalto la Rama Judicial, y en particular los poderes que le corresponden a la Jueza Presidenta, no quise ser cómplice de tan lamentable proceder. En esa dirección, no asistí a la única reunión (sí, una sola) en la que se le dio forma a este atentado contra la democracia. Y no asistí, no porque no

estuviese claro sobre cuáles eran, y son, mis funciones en este Tribunal, esas las tengo bien claras. No asistí porque soy de la opinión que actuaciones como éstas son las que continúan lacerando la ya maltrecha imagen de la Rama Judicial. Ello, como mínimo, debe levantar nuestra capacidad para indignarnos. Indignación que manifesté de forma simbólica, con mi ausencia a la referida reunión y hoy, en concreto, a través de este Voto Particular Disidente en el asunto que nos ocupa.

Ese es el ambiente que permea en el Tribunal Supremo de Puerto Rico. A través de estas sencillas palabras, no pretendo convencer a ninguno de mis compañeros jueces y compañeras juezas de este Tribunal de la corrección o no de su cuestionable proceder, a ellos y a ellas la historia les juzgará. Sólo busco llevar un mensaje, hacer consciente a esa nueva generación de puertorriqueños y puertorriqueñas que hoy se levanta, a los líderes del mañana, que -- por conductas como las descritas en los párrafos que anteceden -- para mejorar como sociedad todavía nos falta mucho por hacer. No olvidemos nunca el valor de la humildad en el desempeño del servicio público.

Ángel Colón Pérez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*In re:*

ER-2018-1

Aprobación de enmiendas al
Reglamento del Tribunal de
Apelaciones

RESOLUCIÓN

En San Juan, Puerto Rico, a 26 de febrero de 2018.

Se enmienda *Nunc Pro Tunc* el Voto de Conformidad del Juez Asociado señor Martínez Torres de 23 de febrero de 2018, a los únicos efectos de hacer constar que el Juez Asociado señor Kolthoff Caraballo se unió al mismo.

Lo acordó el Tribunal y lo certifica el Secretario del Tribunal.

Juan Ernesto Dávila Rivera
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Aprobación de enmiendas al
Reglamento del Tribunal de          ER-2018-03
Apelaciones

RESOLUCIÓN NUNC PRO TUNC

En San Juan, Puerto Rico, a 1 de marzo de 2018.

Se enmienda la Resolución Núm. ER-2018-1, *Aprobación de enmiendas al Reglamento del Tribunal de Apelaciones*, a los únicos efectos de corregir el número de la Resolución al ER-2018-3.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo.

Juan Ernesto Dávila Rivera
Secretario del Tribunal Supremo